69 A.3d 1066

**Karl Marshall WALKER, Jr.**

**v.**

**STATE of Maryland.**

**No. 74 Sept. Term 2012.**

Court of Appeals of Maryland.

July 8, 2013.

Katherine P. Rasin, Assistant Public Defender (Paul B. DeWolfe, Public Defender, of Baltimore MD) for Petitioner.

Brenda Gruss, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore, MD) for respondent.

Argued before BELL,* C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BARBERA, J.

While working at a Howard County elementary school, Petitioner Karl Marshall Walker, Jr. gave to an eight-year-old female student a series of notes in which he repeatedly professed his love for her, shared fantasies of kissing and holding her, and expressed jealousy about her having a boyfriend. At the time he wrote these messages, Petitioner was 38 years old. Following a bench trial in the Circuit Court for Howard County, Petitioner was convicted of sexual abuse of a minor and attempted sexual abuse of a minor under Maryland Code (2002, 2012 Repl.Vol.), § 3–602 of the Criminal Law Article.[1] Sexual abuse is defined at § 3–602(a)(4)(i) as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." The Court of Special Appeals affirmed the convictions. *Walker v. State*, 206 Md.App. 13, 47 A.3d 590 (2012).

---

* Bell, C.J., participated in the hearing of the case, in conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

1. All statutory references hereinafter are to the Criminal Law Article unless otherwise noted.

Petitioner does not deny that his behavior was highly inappropriate but he argues that his actions did not amount to a crime. He also argues that a search of a desk he used at the school violated his right under the Fourth Amendment to be free from unreasonable searches and seizures. We granted a petition for a writ of certiorari, *Walker v. State,* 429 Md. 81, 54 A.3d 759 (2012), to answer the following questions:

1. Did the lower courts err in holding that Petitioner did not enjoy a reasonable expectation of privacy in his work desk for purposes of a Fourth Amendment challenge to a search of the desk?

2. Whether sexual abuse of a minor is committed by the exchange of non-sexually explicit letters and drawings?

For reasons we shall explain, we answer no to the first question and yes to the second. Accordingly, we affirm the judgment of the Court of Special Appeals and uphold Petitioner's convictions.

## I.

A student teacher, while moving the children's desks in a third-grade classroom at a Howard County school on March 17, 2010, discovered an unusual note in the desk belonging to an eight-year-old female student, whom we shall refer to simply as C.[2] The note appeared to be written to C from Petitioner, a paraeducator[3] for the school's special education program who was assigned to help certain students in that classroom. The student teacher testified at Petitioner's subsequent trial that the letter was inappropriate, disturbing, and "something that ... should not have been in a child's desk." She immediately showed the note to the third-grade teacher, Ms. P, who testified that it was "alarming."

---

2. We refer to the victim and many of the witnesses by the initial of their first name in an effort not to reveal the identity of the victim in this case or the school that she attended.

3. A paraeducator is a type of instructional assistant or teacher's aide.

The letter was addressed to "Steelergirl" and signed, below four heart symbols and four Xs, by "Raven–K." The contents were as follows: [4]

U won't see me after school 2day. I really miss u when we r away. I can never get any time wit u. U look so pretty n gorgeous 2day. Purple is my favorite color and u look so good in it. I had a dream that we went 2 Las Vegas on a plane. I was screaming loud and you said, "Stop being a bitch and man-up." I said, "O.K." I love when u r forceful and mad. We had fun holdin hands and hugging. We watched movies and went to a club to dance.

I loved the bear u made me. I hoped the MSA [5] went well. U r so smart and beautiful. U r right. I care about u so much. My heart aches when Im away from u. If anyone ANYONE hurts u, I would fuckin kill them.

Know that my [heart symbol] will always b-long 2 u. I do think about kissing u sometimes but I'd never do it if u didn't want 2. At least I can kiss your picture every night. I know this is a little strong but its how I feel bout you.

I hope u miss me as much as I miss u when we r away. [Eye symbol] m n [heart symbol] with U always.

C testified that Petitioner called her Steelergirl in his letters and she referred to him as Raven–K because she was a fan of the Pittsburgh Steelers football team and he was a fan of the rival Baltimore Ravens team. Ms. P presented this letter, along with C's writing journal,[6] to the school's principal,

---

4. The letters contain numerous misspellings and sometimes use symbols or numbers in place of words and letters. We have reproduced the letters as they were written, though we have at times altered the formatting for ease of reading.

5. MSA stands for the Maryland School Assessment, a mandatory test administered yearly to third-grade students.

6. Ms. P stated she took the writing journal to the school's principal, Mr. M, that same day because of earlier questions that were raised after C wrote a story in which she went camping with Petitioner. The school psychologist read the story and concluded it was a "simple camping trip" and not a cause for concern because there was no indication that

Mr. M, around 3:30 p.m. that day. Mr. M testified that he was immediately concerned by the letter, and he searched C's desk to see if there were other similar letters. After finding a second letter, Mr. M called the school district's central office and alerted police. A member of the Howard County Police Department arrived to take the letters and begin an investigation. Although Mr. M testified that he did not recognize the handwriting in the letters, he said that he suspected Petitioner was "Raven–K" because Petitioner's first name began with the letter K and he was known to be an enthusiastic Ravens supporter. Ms. P testified that she was familiar with Petitioner's handwriting because of his work with her students, and she identified all of the letters from Raven–K as having been written by Petitioner.

Mr. M called Petitioner that evening but Petitioner did not return the call until the next morning. Mr. M told Petitioner that, pending further investigation, he was not to come to the school. Petitioner asked what was happening and Mr. M told him he was not at liberty to discuss it. Petitioner did not come into the school that day and never asked to retrieve his belongings from his desk.

By the time the letter was discovered, Petitioner had been working at the school as a paraeducator for nearly three years. Petitioner was assigned to multiple classrooms where he worked with specific special education students who had defined disabilities; he also helped other students as the need arose. Additionally, he assisted with the dismissal of students at the end of the school day. Petitioner was assigned to work with several students in the third-grade class and spent about an hour per day in that classroom. School employees described Petitioner as having a problem with professional boundaries because he was "overly friendly" with many students at the school; he acted more like a friend than a teacher, gave students high-fives in the school hallways, or hugged them. Ms. P stated she counseled Petitioner that it

---

Petitioner and C shared a sleeping bag or did anything else inappropriate.

was against school policy to give candy to students after she saw him give a candy bar to one girl but no one else. Petitioner talked to some students more than others, including C and her sister, and C often initiated hugs with Petitioner, according to Ms. P. C testified that Petitioner gave her candy and money, hugged her, and sometimes held her hand, although she stated that he also hugged other students at school. Petitioner and C would hug and exchange letters at the end of the school day by C's bus, and she would read the notes from him on the bus before putting them in her backpack.

The day after the letters were discovered, Howard County Police Detective Erica Heavner and a partner arrived at the school around 10 a.m. to talk with Mr. M. Mr. M signed a consent form giving police permission to search a desk that was used by Petitioner. Petitioner's desk was grouped together with those of other paraeducators in a pod located in a common area near several classrooms. Although employees can request a key to lock the desk drawers, Petitioner did not do so and his desk drawers were unlocked.[7] The drawers on the right side of the desk were labeled, from top to bottom, "seminars, research data"; "student data"; and "learning," and a thin drawer in the middle of the desk was marked "utensils + desk items." The desk contained various drawings by students, a paraeducator voluntary transfer form, greeting cards, and a cardboard box marked "Christmas lights." Det. Heavner opened the box and discovered numerous pieces of paper stuffed inside. She seized the box and, after obtaining a search warrant, discovered notes and drawings from Steelergirl to Raven–K inside.

C's parents received a call from the school about the first letter on the day it was discovered and met with detectives that same day. After learning about the letter, C's mother searched her daughter's backpack and discovered approximately 18 notes apparently written by Petitioner to C. She

---

7. Petitioner also was entitled to request a private locker where he could store personal items, but he did not ask for one.

found 10 additional letters several weeks later and turned those over to police. The letters were all addressed to Steelergirl and the contents of the letters read as follows:

- "I missed you so much. I hate the weekends because I don't get to see you. Sorry you lost the last game but you are still a winner to me. Your smile brightens my day. You are so beautiful. I just want to hold, hug, and be with you. You are my girl. So special. Do very well on the MSAs. You probably won't see me much, but know that I am always thinking of you. I hold your picture close to my heart all the time. Love and XXXX (kisses), Raven–K. 'U have my heart.' " The contents of this letter was written within a heart-shape. On the back of the paper is a drawing showing what appears to be a male stick figure holding hands with a female stick figure with a heart appearing above their hands that states "RK + SG."

- "Here is something sweet for the sweetest girl I know. Can I ask you to be my girl? I love having you in my life. I won't ask you for anything than to just be there for me. I need you in my life and can't live without you. Just be there for me. Have yourself a great weekend and I'll miss you till Monday. M[eye symbol] [heart symbol] B longs 2 U. P.S. When you hug me tight, It's the best part of my day. Only YOU make me feel so special. I hope I make you feel good and special. You are to me. [four heart symbols] 4 ever, Raven–K." On the back of the note, Petitioner wrote: "My heart aches when I am away from you. [drawing of lips] XXXX. These are kisses." The note itself also contains a stick figure drawing of what appears to be a male figure wearing glasses holding hands with a female figure with long hair with a heart appearing above their hands.

- "Things I love." [The remaining content was written within a heart shape.] "God, Music, Family, Life, Fitness, Exercise, Ravens, football, baseball, basketball, Jazz, Piano, Steeler Girl." The words "Steeler Girl" were written at the bottom of the heart and were larger than the other words. "P. S. I hope you don't think I'm weird, but I really do care about you. Raven–K."

● "I liked your outfit today. You always look cute.... When you gave me a hug it made my day. My name means 'strong free man.' Let me know what picture you want me to draw. You have become my very best friend. I hope you never forget me. Love you. P.S. Whenever we talk, my heart races a 1,000 beats per minute. You have won my heart forever. Love, Raven–K."

● "I really missed you over the weekend. The whole weekend I kept thinking about you. Wondering what you were doing. Sorry for being in a funky mood 2day. I have to be honest with you. I am sad because I really love you and I know I'm not supposed to. I'm not some perverted child psycho stalker. I don't think perverted thoughts of you. I just have a deep love and care for you. I keep trying to stop feeling this way about you, but I just can't. I have dreams every night of holding you, you sleeping in my arms. Having belching contests. Arguing over the Ravens and Steelers (they suck suck suck). Then you get real mad and starting beating me up. Then we apologize, hug, and hold hands. When I see you I get so happy, then I get very sad. I can't hold your hand. We can never spend time together. Seeing you go home on the bus is the worst part of my day. I love giving you things because it's the only way I can show you how much I love you. I feel like I'm going crazy. I also heard you have a boyfriend. That has me very depressed. Please don't think of me as some creep or monster. I don't want to lose your respect. I feel like Cullen in the Twilight stories and you are the girl.[8] I have tried to make myself not like you, but too late. I have fallen for you

---

8. "The *Twilight* series is a take on the archetypal love story, combining the young adult genre with vampire-romance-themed fantasy" that tells the story of a 17–year–old girl who falls in love with a vampire, Edward Cullen. Margaret Leidy, Comment, *Protecting Creation: The* Twilight *Series, Creation Stories, and the Conversion of Intangible Cultural Property*, 41 Sw. L.Rev. 509, 509 (2012). The best-selling series, by Stephenie Meyer, is comprised of four books that have each been turned into films. *Id.* The Circuit Court stated, in delivering its verdict, that it was aware of the *Twilight* series and found it to be "fairly common knowledge" that the books and films are "geared toward teenagers and younger [children]" and clearly involve romance.

hard. Maybe I do need to go to another school. Just know that I am totally in love with you and will never stop caring for you. I am sorry for feeling this way about you. Please don't think bad of me. Love 4ever, Raven–K. P.S. Tear this up after you read. Tear the other notes too."

• "Your sister told me about you and [another boy at her school]. You could have told me. I won't bother you anymore. Raven–K. [symbol of a frowning face and a faint drawing showing a heart split open as if broken]"

• "I hope your day went well today. I missed you so much when I left early.

I get so sad when I am away from you. Also I am sorry for picking you up too high. I never want to scare you and will not do it again. You mean so much to me. I think about you and keep your picture close to my heart. Anyway, here is . . . [This portion of the letter is set off from the rest, with two squiggly lines surrounding it.] My Dream. We went to the movies to see Twilight Eclipse. You sat in my lap and put your arms around my neck and kissed me on my cheek. THEN FELL SLEEP! [symbol of a face with its mouth open] I tried to wake you but you snored LOUD in my face. So I kissed you 7 times on your forhead and once on your lips. You woke up and we watched the rest of the movie with you in my arms and your head on my chest. [The Dream story ends here.] Have a great day and know you can ask me for ANYTHING you want or need. I deeply love you. [heart symbol with a smiley face inside] Love, Raven–K."

• "Have a great weekend. I want you to know that you can be honest with me and tell me anything. I will always care about you. I have heard some things, but then again I don't pay attention to rumor. Just know that I will always be here for you. Know that I will never hurt you nor let anybody else hurt you. My love and care for you runs deep. If you want a boyfriend or like someone, I will understand. I want you to be happy regardless. I won't lie, but it will hurt me to my heart, but again I want you happy. Always write to me. I am here to listen to you and understand. I

love you always and unconditionally. [heart with a smiley face] Just know that love U 4ever, Raven–K."

• Petitioner spelled out C's name in a heart and used the initials of her first and last name to give her compliments, including that she was "beautiful" and "your are my heart."

• "I like seeing you smile at me again. It really makes my day. I hope your day was a happy one too." [Petitioner spelled out C's first name and gave her compliments based on the initials of her name, including that she was his "only love."] "Thanks for making me smile again. [smiley face] I don't ever want to lose you again. Yours forever, Raven–K. Olive you."

• "Sorry for not coming to the Valentine Day Party. I was really sick on Friday with 103 degree temperature. I liked my Valentine Day note. You are very special and my heart will always be with you. If you ever need anything please tell me. If you are ever sad, think sweet thoughts. [smiley face] I really missed you over the weekend. [frowning face] We have to play basketball so that I can see if I can beat you. Love you, forever [Petitioner spelled out C's initials and listed traits based on those letters.] Seriously, You are awesome. Love, Raven–K. [two smiley faces]"

• [This letter is in the shape of a cut-out heart.] "I want you to have an awesome weekend and know I love you so much. Only your hugs can melt my heart. When you hold my hand it makes my day. Can you be my sweetheart forever? Also, can you not ever stop giving me hugs? I will always be here for you. If we are to ever part, promise that we will find each other. Love you, forever Raven–K."

• "A Snow Poem. When the weather outside is frightful. Being at home is so delightful. But it makes me miss you so. When school is closed because of the snow. YOU R SNOW BEAUTIFUL. [smiley face and drawing of a snowman] Olive [C's name] Raven–K. [heart]"

• "How are you today? I always miss you at the end of school. But when I close my eyes I always see your face. You are so pretty and smart. These are the reasons I think

you are wonderful and care about you so much. 1. You are so beautiful. 2. You are a good person. 3. [Describes her hair] 4. You are intelligent. 5. You like to crack jokes and have sense of humor. 6. Even when you are mad I think you are so pretty. 7. You like music. 8. You like being different. I love being different too. That is why I am an artist. Anyway just know that right now I am missing you and I keep you close to my [heart with smiley face]. Love, Raven–K. P.S. Whenever you answer questions in class I always say in my mind 'You Go Girl.' One day we will go to a football game. Ravens vs. Steelers."

• "Thank u 4 reading with me. It seems evrytime I wanna spend time with u some 1 interrupts. I wanted to kick those kids n their stupid heads. U looked so pretty 2day. [eye symbol] m n [heart] with u so much. I wish we could spend more time 2gether. U r so much fun. Write 2 me when u get a chance. [heart]ed your bear u made 4 me. I hope your sister was not sad 2day. She is a good friend but you r my girl and my love. Never 4get that. [four hearts] you, Raven–K."

• "I miss you badly when I am away. I get sad, too. See u 2morrow. P.S. Congradulations on making Honor Roll. I am very proud of you. [smiley face] Raven–K."

• Two of the notes encourage her to do well on the Maryland State Assessment test.

• "HERE'S a friend to keep You company in the snow. [heart with the words 'Olive U' inside] Raven–K."

• Two of the notes were addressed to "My Steelergirl" with those words inside a heart and no other message.

• A series of notes contain mostly drawings: the cartoon birds from the animated short film *For the Birds*, a shark, the cartoon character Snoopy, the character Nemo from the animated film *Finding Nemo*, the Cat from Dr. Seuss's book *The Cat in the Hat*, and the cartoon characters Daffy Duck, the Tasmanian Devil, and Tweety Bird from the Looney Tunes cartoon franchise.

• A post-it note reads: "P.S. [Another female student] asked if I had six pak abs. I said yes but they r 4 one person (that's Steelergirl) Love U. [drawing of a muscular person with a heart-shaped head smiling]"

On March 18, 2010, the same day that police searched his desk at school,[9] Petitioner agreed to speak with detectives at the police station about the investigation. He wore a Ravens jacket to the interview, which lasted less than an hour. Petitioner told police he cared deeply for C but denied having romantic feelings or a physical attraction to her. He stated his purpose was to help C deal with her temper and to be a friend, "not to groom somebody's child with the purpose of committing any type of lewd act or anything like that."[10] Petitioner described the reference to taking C on a trip to Las Vegas as just a dream and "not something that could ever realistically ever happen." When Petitioner told C he wanted to take her to a football game, Petitioner claimed he meant when she was older. He denied being upset at the thought of C having a boyfriend. Petitioner stated he knew C had a crush on him and described his actions as being in a "gray" area when he wrote to C that he loved her and told her he kissed her picture every night. He acknowledged that if a school employee wrote those types of letters to one of his children that he "wouldn't be happy about it" because it would

---

**9.** Police also searched Petitioner's home pursuant to a search warrant but did not uncover any evidence.

**10.** Petitioner made several references to "grooming" during the course of the police interview. The United States Court of Appeals for the Fourth Circuit has noted that the sexual abuse of minors is "often carried out through a period of grooming." *United States v. Engle*, 676 F.3d 405, 412 (4th Cir.2012) (quoting *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir.2011)). "Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *Id.* Petitioner defined the term to investigators as "a process in which ... child sexual predators will get to know and befriend, you know, underage kids," in part by giving them candy and money. The word "grooming" is not used in the statute governing sexual abuse of a minor.

be "not appropriate." C was the only student he wrote to in this manner.

Petitioner was indicted by a Howard County grand jury on counts of sexual abuse of a minor and attempted sexual abuse of a minor. The Circuit Court held a hearing on Petitioner's motion to suppress evidence found in a search of his desk at school and denied the motion. The case came on for a bench trial before the Circuit Court. Following receipt of all the evidence, the court denied Petitioner's motion for judgment of acquittal and found Petitioner guilty of both charges.

In delivering the verdict, the court read aloud from several of the letters and observed the increase, over time, of the "passionate content" of the notes. The court concluded that it was "clear in reading these letters and the totality of these letters and the other actions that [C] was certainly, without question, the object of [Petitioner's] fantasies and obsessions" and the notes he received from her, the hugs, the hand holding, and the sharing of fantasies were "all for his benefit." The court found credible the testimony of C and her mother about the serious negative psychological impact Petitioner's behavior had on C.[11] The court concluded:

> Sexual acts are not only limited to physical acts. Taking all of the evidence into consideration I find that the totality of the letters, the hugging, the holding hands, were all evidence that [C] was exploited and exploited within the meaning of the Child Sexual Abuse Statute.

> These letters set the stage for future acts and were extremely suggesting in an inappropriate and sexual manner. Certainly not the types of letters a thirty-eight-year old man in his position should send to an eight-year-old girl. As I mentioned, he used these actions in order to gain her trust and then subsequently abused her trust.

> I know there's a suggestion that the letters were inappropriate and perhaps passionate but not sexual in nature. It's

---

11. C's mother described her daughter as "broken hearted" about the incident and said conversations about Petitioner typically led to huge temper tantrums.

hard to read these letters, including the totality of these letters, and not find that they were sexual from the standpoint that the passionate comments they contained bordered, almost border on obsession, contained expressions of jealousy and certainly had sexual undertones.

Unfortunately, [Petitioner's] fantasies became an eight-year-old girl's reality. And this is evidenced by the effect that these letters and these actions had on [C] as observed by her mother.

So I find that the letters, the hugs, hand holding and fantasies were all for [Petitioner's] benefit and he exploited [C] for his benefit. He kept all of the notes that he received which is further evidence that the exploitation was for his benefit. And in looking at the legislative intent of this statute, it's hard to imagine that the legislative intent would not include these actions as falling within the ambit of the Child Sexual Abuse Statute.

The court, after merging the attempt count with the completed sexual abuse of a minor charge, sentenced Petitioner to 13 years incarceration with all but seven years suspended, followed by five years of supervised probation. The Court of Special Appeals affirmed the convictions, concluding that (1) the Circuit Court did not err in denying the motion to suppress evidence found in Petitioner's desk and (2) the evidence was sufficient to support Petitioner's conviction for sexual abuse of a minor. *Walker v. State*, 206 Md.App. 13, 27, 51–52, 47 A.3d 590 (2012). The present appeal followed.

II.

*The Search of the Desk*

Petitioner challenges the Circuit Court's denial of his motion to suppress evidence found in a desk assigned to him at the school. He argues that the police search of the desk violated his right to be free from unreasonable searches and

seizures under the Fourth Amendment.[12] In reviewing the denial of a motion to suppress, we view the suppression court's findings of fact and reasonable inferences in the light most favorable to the prevailing party on the motion. *McCracken v. State,* 429 Md. 507, 515, 56 A.3d 242 (2012). "We conduct 'our own independent constitutional appraisal' of whether the Fourth Amendment has been violated by applying the law to the facts of the matter *sub judice.*" *Id.* (quoting *Bailey v. State,* 412 Md. 349, 362, 987 A.2d 72 (2010)).

 It is bedrock law that the rights accorded by the Fourth Amendment "are implicated only if the conduct of the [government] officials at issue . . . infringed 'an expectation of privacy that society is prepared to consider reasonable.' " *O'Connor v. Ortega,* 480 U.S. 709, 715, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion) (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). *Accord Kyllo v. United States,* 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); *Bond v. United States,* 529 U.S. 334, 338, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (quoting *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)); *Corbin v. State,* 428 Md. 488, 499, 52 A.3d 946 (2012); *Whiting v. State,* 389 Md. 334, 348, 885 A.2d 785 (2005) (citing *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). This inquiry, often referred to as the *Katz* test, has two distinct parts, each of which must be satisfied in order for the Fourth Amendment to apply: (1) a defendant must "demonstrate an actual, subjective expectation of privacy in the item or place searched" and (2) "prove that the expectation is one that society is prepared to recognize as reasonable." *Corbin,* 428 Md. at 499, 52 A.3d 946.

---

12. The Fourth Amendment, which is applied to the states through the Fourteenth Amendment, guarantees that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." *See Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59 (1991).

■ The parties do not dispute the underlying facts about Petitioner's desk, its location in the school, or the materials—including letters and drawings given to him by C—that were found there.[13] Likewise, the parties agree that the search was conducted at the behest of law enforcement officers who were given permission by the school principal to search the desk. Under the Fourth Amendment, a defendant "has the burden of demonstrating that he has a legitimate expectation of privacy in the material to be seized." *Id.* Our colleagues on the Court of Special Appeals concluded that Petitioner did not carry that burden. *Walker,* 206 Md.App. at 26–27, 47 A.3d 590. We agree.

The desk assigned to Petitioner was not located in a classroom but rather in the first grade "pod." Several photographs entered into evidence depict the pod as an open common area between several classrooms at the school. The layout is similar to a wheel, with the pod area serving as the "hub" and the classrooms branching out like spokes. Specifically, the pod area is connected to three first-grade classrooms, a technology classroom, and an alternative education classroom. Numerous windows would allow a person to look into the pod area from the classrooms. Petitioner's desk was situated on the outside perimeter of the pod, near the desks of two other paraeducators.

Petitioner argues that the desk assigned to him was exclusively for his use; the school's policies allowed paraeducators to keep their desks from year to year and nothing in the record indicates that these policies authorized searches of employees' desks. Petitioner adds that there was no evidence suggesting that anyone else used the desk assigned to him,

---

13. Investigators discovered in their search of the desk a school-transfer request form; drawings, greeting cards, and school work belonging to other students; a business card; photocopies of a chapter from a book entitled "Laughter: A Scientific Investigation"; and the Christmas lights box that contained the notes from C. The only items of evidence seized from the desk that were remarked upon by the State during closing argument were the letters from C, and those letters were the only evidence from the search mentioned by the trial court in issuing its verdict.

and the search was done exclusively for the benefit of, and at the behest of, law enforcement. Notably, Petitioner did not testify at the suppression hearing, nor did he present any other testimony or evidence in support of his argument.

The State counters that the desk was unlocked and located in a public, well-traveled area of the school accessible to students, teachers, and staff. The State cites testimony from the school principal indicating that people might look in the desk "to borrow a pencil" and notes that the desk drawers contained labels suggesting they were for use by other teachers or students, such as "utensils + desk items."

In the context of searches at a workplace, the *O'Connor* Court stated the following:

> Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the workplace context. The workplace includes those areas and items that are related to work and are generally within the employer's control. At a hospital [the workplace at issue in *O'Connor* ], for example, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are all part of the workplace. These areas remain part of the workplace context even if the employee has placed personal items in them, such as a photograph placed in a desk or a letter posted on an employee bulletin board.

480 U.S. at 715–16, 107 S.Ct. 1492.

Of course, "[n]ot everything that passes through the confines of the business address can be considered part of the workplace context." *Id.* at 716, 107 S.Ct. 1492. For example, the contents of an employee's briefcase, personal luggage, or purse generally would not be subject to the standards of a workplace search. *See id.* The Supreme Court has recognized, moreover, that, even "[w]ithin the workplace context, . . . employees may have a reasonable expectation of privacy against intrusions by police." *Id.*

Thus, in *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), which, like *O'Connor*, involved a workplace search, the defendant argued that his Fourth Amendment rights were violated when investigators seized union records from an office shared by the defendant and several other individuals. 392 U.S. at 365, 88 S.Ct. 2120. In holding that the search was unreasonable, the Supreme Court concluded that the defendant had a reasonable expectation of privacy in the records stored in his private office, even if he did share that office with other union officials. *Id.* at 369, 372, 88 S.Ct. 2120.

In *O'Connor*, the Court considered whether the Fourth Amendment was violated when hospital employees searched a doctor's office at a state hospital in connection with an investigation while he was on administrative leave.[14] 480 U.S. at 712–14, 107 S.Ct. 1492. The Court concluded that the doctor had a reasonable expectation of privacy in his desk and filing cabinets, noting that he had occupied the office for 17 years, did not share his desk or filing cabinets with other employees, kept many personal items in his office, and was not discouraged from doing so by any hospital policy. *Id.* at 718–19, 107 S.Ct. 1492. The Court remanded the case for further fact-finding to determine the justification for the search and whether it was reasonable. *Id.* at 729, 107 S.Ct. 1492.

The *O'Connor* plurality offered several principles governing workplace searches that are relevant here. It is clear that public employees, such as Petitioner, can have a reasonable expectation of privacy in their work spaces. *Id.* at 717, 107 S.Ct. 1492. But "[p]ublic employees' expectations of privacy in their offices, desks, and file cabinets ... may be reduced by virtue of actual office practices and procedures, or by legitimate regulation." *Id.* The mere fact that other employees or the public may enter an office does not automatically make

---

14. The Fourth Amendment argument was considered in the context of a 42 U.S.C. § 1983 claim by the doctor against hospital officials. *O'Connor v. Ortega*, 480 U.S. 709, 711, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (plurality opinion).

one's expectation of privacy unreasonable; context matters and each situation must be analyzed on its facts.[15] *Id.* at 717–18, 107 S.Ct. 1492. Indeed, "some government offices may be so open to fellow employees or the public that no expectation of privacy is reasonable." *Id.* at 718, 107 S.Ct. 1492.

We analyzed the propriety of a workplace search in *Faulkner v. State,* 317 Md. 441, 564 A.2d 785 (1989). In *Faulkner,* management representatives at a Baltimore City plant searched employee lockers after receiving reports of widespread drug and alcohol use during a particular shift. *Id.* at 442–443, 564 A.2d 785. Police were on hand for the search in case drugs or weapons were found. *Id.* at 443, 564 A.2d 785. The searchers found a used hypodermic syringe with a needle and a plastic bag containing cocaine inside a locker with the defendant's name on it. *Id.* at 444, 564 A.2d 785. We concluded that the defendant had "only a minimal, if any, expectation of privacy" in the locker given that it was owned by the company, used to store company and personal items, and subject to a company policy allowing searches on a reasonable basis, such as when drug and alcohol use was suspected on the premises. *Id.* at 447–48, 564 A.2d 785. We held that the search was reasonable, particularly in light of the fact that the defendant initially claimed another locker belonged to him.[16] *Id.* at 448, 564 A.2d 785.

---

**15.** The *O'Connor* plurality laid out a balancing test for when employers conduct a search in violation of an employee's reasonable expectation of privacy, 480 U.S. at 719–20, 107 S.Ct. 1492, but that test is inapplicable here as the search was conducted by law enforcement. The Supreme Court has declined to state whether the plurality's reasoning controls. The Court, however, has continued to apply the plurality's reasoning to workplace cases. *See City of Ontario v. Quon,* — U.S. —, 130 S.Ct. 2619, 2628–29, 177 L.Ed.2d 216 (2010) (concluding that applying the *O'Connor* plurality and Justice Scalia's *O'Connor* concurrence to the facts of the case would lead to the same result).

**16.** The Court of Special Appeals likewise has analyzed workplace searches on several occasions. *See, e.g., Martin v. State,* 113 Md.App. 190, 234–36, 686 A.2d 1130 (1996) (holding that an officer did not have a reasonable expectation of privacy in his police cruiser because, even though he was allowed to use it while off-duty, there were strict

The parties cite several out-of-state cases that they claim provide persuasive support for their respective positions. *Compare, e.g., United States v. Asad,* 739 F.Supp.2d 1127, 1137 (D.Ill.2010) (holding that a liquor and food store employee did not have a subjective expectation of privacy in an unlocked desk in an office area where several other employees routinely visited), *with Commonwealth v. Jackson,* 809 A.2d 411, 415, 417 (Pa.Super.Ct.2002) (upholding a trial court's suppression of evidence discovered in the desk of a postal employee because there were no written procedures or policies authorizing a search and no exigent circumstances excused a state trooper from obtaining a warrant).

These and other cases are of some use in considering whether Petitioner demonstrated a legitimate expectation of privacy in the desk. For instance, the record does not indicate that Petitioner's desk was widely used by other school employees or students. *See United States v. Craig,* 32 M.J. 614, 615 (1991) (holding there was no reasonable expectation of privacy in an unlocked, government-owned desk used by others that the appellant was ordered to keep unlocked and free of personal items). But the record is also clear that the desk was unlocked, potentially accessible to others who might be in search of pencils or other supplies, and Petitioner did not seek to lock the desk or to place his valuables in an available private locker. *See Konopka v. Borough of Wyo.,* 383 F.Supp.2d 666, 672, 679 (M.D.Pa.2005) (concluding that a reasonable fact-finder could find a plaintiff in a § 1983 claim had a reasonable expectation of privacy in the contents of his desk where there was evidence that only he was allowed to use the drawers in the desk, they were kept locked, and other employees only had permission to use the top of the desk). In the end, though, these cases teach simply that determining whether one has a reasonable expectation of privacy in a particular space (e.g., office, desk, locker) at the workplace is a highly fact-specific inquiry.

---

regulations governing how the vehicle was used and permitting frequent inspections).

We also take note of cases from outside of Maryland that have specifically addressed the expectations of privacy held by teachers and others within the education system. The expectation of privacy in a school setting is much like that of any other workplace and hinges on the particular facts of a given case. In *Gillard v. Schmidt,* 579 F.2d 825 (3d Cir.1978), the Court of Appeals for the Third Circuit held that a guidance counselor had a reasonable expectation of privacy in the papers contained in his office, which was located in a large, locked room partitioned into smaller offices. *Id.* at 826, 828–29. In reaching its conclusion, the Court noted that the guidance counselor dealt with "students' private, personal problems," there was no policy authorizing a search, and the local school board later condemned the search, which had been conducted by a member of the school board. *Id.* at 828. *See also Shaul v. Cherry Valley–Springfield Cent. Sch. Dist.,* 363 F.3d 177, 182 (2d Cir.2004) (noting that the fact that teachers and others had access to a teacher's classroom and sometimes picked up supplies there did not extinguish the teacher's privacy interest in his desk and locked file cabinets).

As we consider the facts here, we bear in mind that Petitioner must demonstrate that he had a subjective expectation of privacy *and* that this expectation is one that society is prepared to accept as reasonable. We conclude that the undisputed facts developed at the suppression hearing show that Petitioner did not enjoy even a subjective expectation of privacy in the desk. To be sure, several facts point in the direction of Petitioner having a subjective expectation of privacy. The desk was assigned to him and he was its sole user. Petitioner had used the same desk in prior years and stored personal, as well as work-related, items in the desk. And, unlike in *Faulkner, supra,* there was apparently no school policy that would have put Petitioner on notice of the potential of a search.

Other facts, though, suggest the contrary expectation. The desk was owned by the school system and located in an open area between classrooms. The door leading to the pod where Petitioner's desk was located was secured only at night and

teachers and students frequently passed by the desk during the day. The desk was not locked, despite Petitioner having the ability to request a key to lock the desk. Petitioner also had the option of requesting a locker for his personal belongings, but did not use one, which supports an inference that anything kept within his desk was more likely to be school-related than personal because he otherwise likely would have sought out a personal locker.

Additionally, the school's principal testified that someone might open the desk drawers to borrow a pencil. This would have been made more likely by the generic labels placed on Petitioner's desk drawers, which included descriptions such as "utensils + desk items." Although it is not unusual for people to categorize and label their personal belongings, even if they do not intend for others to see them, these labels were on the outside of a desk in a heavily-trafficked school setting. A reasonable inference, drawn from looking at some of these labels, would be that work-related items, and not personal ones, are stored in the desk.

■ The facts, in their totality, do not demonstrate that Petitioner had a subjective expectation of privacy in the desk. The open nature of the room; the high volume of traffic around it; the labels on the desk drawers; Petitioner's failure to lock the desk when given the option to do so; and his failure to testify that he believed the desk was for his private use or offer any other evidence to that effect all support our conclusion.[17] Petitioner's failure to meet the first prong of the *Katz* test means that we need not consider the second, objective prong. *See State v. Bridges*, 513 A.2d 1365, 1367–68 (Me.1986) (defendants who made no effort to conceal their movements in a publicly visible location manifested no subjective expectation of privacy and therefore there was no need to consider the objective part of the *Katz* inquiry); *State v. Ross*,

17. Because we hold that Petitioner did not have a reasonable expectation of privacy in the contents of the desk, we need not reach the question of whether the school principal had the authority, or gave detectives the impression he had apparent authority, to consent to a search of the desk.

49 S.W.3d 833, 843–44 (Tenn.2001) (observing that an individual may have an expectation of privacy in a motel room that society would recognize as reasonable, but under the facts of the case, concluding that the defendant had no subjective expectation of privacy after disclaiming any interest in a key to the room). We therefore hold that the officers' search of Petitioner's desk did not implicate the Fourth Amendment.[18] For these reasons, we affirm the decision of the Court of Special Appeals.

## III.

### *Sufficiency of the Evidence*

This case came before us following a bench trial in the Circuit Court for Howard County. Under Maryland Rule 8–131(c),

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

Petitioner argues that the evidence is insufficient to support his conviction of sexual abuse of a minor. In reviewing the sufficiency of the evidence supporting a conviction, "it is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case." *Rivers v. State,* 393 Md. 569, 580, 903

---

**18.** Even if the search were unreasonable under the Fourth Amendment, we find it hard to imagine that suppression of the letters from C would have changed the outcome at trial. The seized notes were all from C to Petitioner; none of the notes from Petitioner to C were discovered in Petitioner's desk. The trial court acknowledged reviewing the notes C sent to Petitioner and described them as part of the evidence that Petitioner's actions were "all for his benefit." Although the trial court, in delivering its verdict, quoted from many of the notes Petitioner wrote to C, the court did not quote any of the notes C sent to Petitioner. Instead, the court stated the notes from C were "further evidence that the exploitation was for [Petitioner's] benefit," after having found that "the letters, the hugs, hand holding and fantasies" were for Petitioner's benefit and constituted exploitation.

A.2d 908 (2006) (quoting *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994)). "Rather, '[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence.' " *State v. Mayers,* 417 Md. 449, 466 (2010) (alteration in original) (quoting *Smith v. State,* 415 Md. 174, 185, 999 A.2d 986 (2010)). The standard we apply requires us to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Rivers,* 393 Md. at 580, 903 A.2d 908 (citing *State v. Smith,* 374 Md. 527, 533, 823 A.2d 664 (2003)); *accord Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

Petitioner was convicted under § 3–602 of sexual abuse of a minor and attempt to commit that crime. The portion of the statute relevant to Petitioner states: "A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor." § 3–602(b)(1). Sexual abuse is defined as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." § 3–602(a)(4)(i). The statute notes that sexual abuse includes incest, rape, sexual offense in any degree, sodomy, and unnatural or perverted sexual practices. § 3–602(a)(4)(ii).

The State does not contend that Petitioner molested C. Rather, the State argues that he committed sexual exploitation, which the State defines in two ways:

(1) any sexual conduct toward a child by which the defendant takes advantage of the child for his benefit (sexual or otherwise); and/or (2) any conduct toward a child by which the defendant takes advantage of the child for his sexual benefit, where "sexual" is defined broadly as relating to sexual organs or drives.

Petitioner concedes that he had "temporary care or custody" of C and that his behavior was "highly inappropriate," but

he argues that his conduct was not sexual exploitation. Petitioner observes that the word "exploitation" is not defined in the statute and maintains that his actions do not constitute exploitation under almost any potential definition of the term, including those used by the federal government and other states. Petitioner argues that all previous cases involving child sexual abuse in Maryland have dealt with behavior that is "unquestionably sexual" and to allow his conviction to stand would "render the statute void for vagueness, violate the rule of lenity, and provide no notice as to what conduct is proscribed."

The term "exploitation" is not defined in § 3–602.[19] As a result, we must turn to the rules of statutory interpretation to discern whether Petitioner's actions can be considered exploitation within the meaning of § 3–602. "In statutory interpretation, our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision...." *Lowery v. State*, 430 Md. 477, 490, 61 A.3d 794 (2013) (quoting *Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md. 697, 712, 962 A.2d 342 (2008)). "We begin our analysis by first looking to the normal, plain meaning of the language of the statute, reading the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Id.* If "the language is subject to more than one interpretation, it is ambiguous, and we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute." *Id.* "In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense." *Green v. Church of Jesus*

---

**19.** Other references to exploitation in the Maryland Code do not relate to child abuse. *See, e.g.,* Maryland Code (1999, 2012 Repl.Vol.), §§ 14–101, 14–302–03, and 14–305 of the Family Law Article; Criminal Law Article § 8–801 (defining exploitation, in the context of statutes criminalizing the exploitation of vulnerable adults, as "any action which involves the misuse of a vulnerable adult's funds, property, or person").

*Christ of Latter-day Saints,* 430 Md. 119, 135, 59 A.3d 1001 (2013) (quoting *Gardner v. State,* 420 Md. 1, 9, 20 A.3d 801 (2011)).

The plain language of the statute itself tells us several things. First, the use of the phrase "an act," instead of an enumerated list of abusive conduct, signals the General Assembly's intent that the child abuse statute be read to include a wide range of behavior. Second, we have observed that the word "involves" implies "a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation." *Degren v. State,* 352 Md. 400, 419, 722 A.2d 887 (1999). Finally, the conjunction "or" between sexual molestation and exploitation indicates that only one of the actions, but not necessarily both, is required to support a conviction for child sexual abuse. Although the word "sexual" is not placed in front of exploitation, and could be viewed as not modifying the term, the title of the statute itself, "sexual abuse of a minor," makes clear that the exploitation must be also of a sexual nature.

The precursor to the current child abuse statute was enacted in 1963. Maryland Code (1957, 1967 Repl.Vol.), Article 27, § 11A, under the heading "Assault on Child," prohibited a parent or other person with temporary care or custody of a child under 14 years old[20] from "maliciously" beating, striking, or otherwise mistreating the child "to such degree as to require medical treatment." This crime was reclassified as "Child Abuse" in 1970 and placed under Article 27, § 35A. *See Pope v. State,* 284 Md. 309, 317–18, 396 A.2d 1054 (1979) (discussing the history of the child abuse statute).

The term exploitation was not added to the child abuse statute until 1974.[21] Chapter 554 of the Acts of 1974. The

---

**20.** The General Assembly amended the law in 1966 to apply to children under the age of 16. *See* Editor's Note, Maryland Code (1957, 1967 Repl.Vol.), Article 27, § 11A. In 1973, lawmakers again changed the law to cover all children under the age of 18. Chapter 835 of the Acts of 1973.

**21.** A year earlier, the General Assembly amended the child abuse statute to change the definition of abuse to encompass any "physical

General Assembly expanded the definition of abuse to include "any sexual abuse of a child, whether physical injuries are sustained or not." Md.Code (1957, 1976 Repl.Vol.), § 35A(b)7(B). Sexual abuse was defined as "any act or acts involving sexual molestation or exploitation, including but not limited to incest, rape, carnal knowledge, sodomy or unnatural or perverted sexual practices on a child." § 35A(b)8. This language stayed largely intact through the re-codification of the Maryland Code and the creation of the Criminal Law Article in 2002.[22] Sexual abuse became "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." § 3–602(a)(4)(i). This language remains the same in the current version of the statute. We found no legislative history, and the parties have not directed us to any, that explains what the General Assembly intended the word "exploitation" to mean within the child abuse statute.

We have observed previously that sexual abuse is not limited to the specified acts of incest, rape, sexual offense in any degree, sodomy, and unnatural or perverted sexual practices listed in § 3–602(a)(4)(ii). The statute states that sexual abuse "includes" these activities, but we have concluded that this list is meant to be merely illustrative and does not preclude other actions from constituting sexual abuse of a minor. *See Degren,* 352 Md. at 428, 722 A.2d 887 (noting that, "given general legislative policy and the purpose of the child abuse statute to protect minors from abuse, we find it difficult to believe the General Assembly chose to limit the forms of sexual abuse punishable to only those listed"); *Tribbitt v.*

---

injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts." Chapter 835 of the Acts of 1973. The General Assembly stated its purpose in enacting the changes was "the protection of children who have been the subject of abuse." *Id.*

**22.** The General Assembly created sexual abuse of a child as a separate offense from child abuse as part of the 2002 recodification. Dep't of Leg. Servs., Floor Report, H.B. 1194 (Md. General Assembly, 2002 Reg. Sess.). The primary motivation was to aid the Department of Public Safety in being able to distinguish between child abusers who committed sexual acts on children and those who abused them otherwise. *Id.*

*State*, 403 Md. 638, 657 n. 14–15, 943 A.2d 1260 (2008) (observing the "general terms" defining sexual abuse "precede the specific list of items" providing "even further indication that the Legislature intended the list of items . . . to be illustrative.").

Moreover, the actions constituting child sexual abuse do not have to be otherwise criminal in nature. In *Tribbitt*, 403 Md. at 641–42, 943 A.2d 1260, we considered a case in which a gym teacher and coach committed a series of acts on a female middle school student. These included having her show him her thong underwear; touching her buttocks; hugging her while having an erection; making a lewd comment; rubbing her buttocks, inner thighs, and vaginal area through her pants; and putting his hand down her pants. *Id.* The defendant argued that these actions could not constitute sexual abuse of a minor because his actions were not criminal in and of themselves. *Id.* at 644–45, 943 A.2d 1260. We disagreed, concluding that the statute's definition of sexual abuse as "an act" and not "an otherwise criminal act" meant that child sexual abuse could be committed without otherwise committing another crime. *Id.* at 649, 943 A.2d 1260.

We had occasion to expound on this concept a few years later when we were asked to determine whether "French kissing"[23] could constitute child sexual abuse. In *Crispino v. State*, 417 Md. 31, 34–35, 7 A.3d 1092 (2010), we considered two incidents in which the defendant French kissed a girl who was six or seven years old at the time. On appeal, the defendant argued that French kissing could not alone constitute child abuse and that the jury should have been required to state whether it was the French kissing, or other more explicit sexual acts, that led the jury to conclude that he was guilty of child sexual abuse. *Id.* at 41, 7 A.3d 1092. We concluded that "French kissing is, in itself, an intimate act

---

23. We have previously observed that French kissing is "an open-mouthed kiss usually involving tongue-to-tongue contact" or "a kiss in which the tongue enters the partner's mouth." *Crispino v. State*, 417 Md. 31, 42, 7 A.3d 1092 (2010) (quoting dictionary definitions).

that has a sexually exploitative effect." *Id.* at 45, 7 A.3d 1092. We observed that the General Assembly "intended for the statute to cover a wide range of conduct," *id.* at 43, 7 A.3d 1092 and although the jury was required to be unanimous on the elements of the crime of child abuse, it "need not be unanimous with regard to the *means* used by the defendant in committing the act," *id.* at 49, 7 A.3d 1092.

Additionally, child sexual abuse does not have to be limited to a single instance but can be composed of an ongoing series of events. We have observed that the "gravamen of the offense [of child abuse] is not the sexual act itself ... but rather the abuse of the child. That abuse can as easily arise from several qualifying acts as from one." *Cooksey v. State,* 359 Md. 1, 23, 752 A.2d 606 (2000). In *Cooksey,* the State alleged the defendant committed cunnilingus, digital and attempted penile penetration of the victim's vagina, fondling and touching of the victim's buttocks and genitals, and rubbing of the defendant's body against the victim's body. *Id.* at 24, 752 A.2d 606. We concluded that child sexual abuse is "a crime that can be committed both by a single act and through a continuing course of conduct consisting of multiple acts." *Id.* A jury could convict the defendant of child abuse under either scenario. *Id.*

Our case law also makes clear that it is not required that a defendant touch the victim to be guilty of child sexual abuse. In *Degren,* 352 Md. at 404–05, 722 A.2d 887, we considered whether a woman with responsibility for taking care of a child could be convicted of child abuse by failing to prevent her husband from raping that child in her presence. In concluding that she could, we acknowledged "the modern trend in broadly recognizing and punishing all forms of child abuse," *id.* at 424, 722 A.2d 887, and we held that child sexual abuse includes not only an affirmative act "but one's omission or failure to act to prevent molestation or exploitation when it is reasonably possible to act and when a duty to do so ... exists," *id.* at 425, 722 A.2d 887. In *Degren,* we approved of the following definition of exploitation: "that the parent or

person having temporary or permanent custody of a child took advantage of or unjustly or improperly used the child for his or her own benefit." *Id.* at 426, 722 A.2d 887 (quoting *Brackins v. State*, 84 Md.App. 157, 162, 578 A.2d 300 (1990)).

We also are informed by decisions from the Court of Special Appeals interpreting the language of § 3–602. In *Brackins*, 84 Md.App. at 160, 578 A.2d 300, the defendant asked a 12–year–old girl under his supervision to unbutton her blouse and expose her breasts so he could photograph them. When she refused, he unbuttoned her blouse, took a photograph, and discarded it shortly after. *Id.* The Court consulted various dictionary definitions of exploitation before concluding that the defendant's actions in disrobing the girl constituted exploitation because they were "for his own pleasure or amusement or gratification or interest." *Id.* at 161–62, 578 A.2d 300.

The Court of Special Appeals most recently considered the meaning of sexual exploitation in *Schmitt v. State*, 210 Md. App. 488, 63 A.3d 638 (2013). In *Schmitt*, the defendant hid a video camera in the closet of the 15–year–old daughter of a woman he was dating. *Id.* at 490–92, 63 A.3d 638. The video camera recorded the defendant masturbating in the girl's room while holding up a piece of her clothing, and then showed the girl at a later point changing her clothes, exposing her underwear-clad buttocks. *Id.* at 491–92, 63 A.3d 638. The defendant argued that his actions did not constitute exploitation because the girl was unaware that he had videotaped her and there was no evidence that the conduct had an adverse impact on her. *Id.* at 494–95, 63 A.3d 638. The Court disagreed, concluding that his conduct in the girl's room and videotaping her undressing gave the fact-finder a sufficient basis from which to conclude that his actions "constituted exploitation of a sexual nature." *Id.* at 502, 63 A.3d 638. The Court further held that proof of an adverse impact on the victim was not a required element of the offense. *Id.* at 503, 63 A.3d 638. The Court relied, in part, on its previous decision in *Walker*, the case we now consider, to reach this

result.[24] *Id.* at 501–02, 63 A.3d 638.

Petitioner argues that a reasonable interpretation of the child sexual abuse statute and its prohibition on the sexual exploitation of minors limits its application to the use of children in pornography, prostitution, and sex trafficking. *See Brackins,* 84 Md.App. at 161, 578 A.2d 300 ("Exploitation of children, through child pornography or sexual molestation and abuse, victimizes the children and possibly causes future psychological harm."). Petitioner maintains that a conviction for child sexual abuse requires "sexual, physical touching," not necessarily at the defendant's hands, or, at a minimum, the use of words that are overtly or inherently sexual. Petitioner contends that this interpretation is consistent with the definition of sexual exploitation used in other state statutes and by the federal government.[25]

We have reviewed other states' statutes cited by Petitioner in his brief and observe that they tend to be more exact than Maryland's statute in defining what constitutes sexual exploitation. *See, e.g.,* Ariz.Rev.Stat. Ann. § 13–3553 (2013) (defining sexual exploitation as "[r]ecording, filming, photographing, developing or duplicating any visual depiction in which a minor is engaged in exploitative exhibition or other sexual conduct" or distributing, receiving, possessing, or otherwise transmitting the same material); Me.Rev.Stat. tit. 17–A, § 282 (2013)

---

**24.** In a similar vein, the Court of Special Appeals in *Raines v. State,* 142 Md.App. 206, 218, 788 A.2d 697 (2002), held the facts were sufficient to sustain a conviction for child abuse where a defendant encouraged his adopted daughter to masturbate privately and then secretly recorded her doing so, and showed his daughter a video of her mother masturbating, taken without the mother's knowledge. Although the father physically molested the daughter during other incidents, the Court held that the secret videotaping, in which the defendant did not touch his daughter, constituted abuse on its own. *Id.*

**25.** Petitioner notes that Black's Law Dictionary defines sexual exploitation as the "use of a person, esp. a child, in prostitution, pornography, or other sexually manipulative activity that has caused or could cause serious emotional injury." Black's Law Dictionary 1407 (8th ed.2004). Petitioner acknowledges that "sexually manipulative activity" is not further defined, limiting the usefulness of the Black's Law definition as a resource.

(sexual exploitation of a minor is committed when a person "intentionally or knowingly employs, solicits, entices, persuades, uses or compels another person, not that person's spouse, who is in fact a minor, to engage in sexually explicit conduct" or when a parent, legal guardian or other person responsible for a minor "knowingly or intentionally permits that minor to engage in sexually explicit conduct, knowing or intending that the conduct will be photographed"). Ultimately, we conclude that these statutes from other jurisdictions do not settle the question of whether Petitioner's conduct constituted sexual exploitation of a minor under Maryland law. The statutes provide evidence that sexual exploitation under Maryland law may include the use of children in pornography and prostitution, but Maryland's law is broader and its language more general than that of any other state or federal statute cited by Petitioner.

Our review of Maryland case law leads us to several conclusions about § 3–602. The statute is not limited to the enumerated acts listed but can encompass a wide range of behavior that need not, in itself, be criminal. Child sexual abuse can be committed as part of a single act or a series of actions and it is not necessary that the defendant physically touch the child in order to commit the crime. The context in which the abuse occurs matters and failing to act to prevent abuse can be criminal. Finally, exploitation requires that the defendant "took advantage of or unjustly or improperly used the child for his or her *own* benefit." *Degren*, 352 Md. at 426, 722 A.2d 887 (citing *Brackins*, 84 Md.App. at 162, 578 A.2d 300).

We observe, too, that § 3–602 is broad. This Court, along with the Court of Special Appeals, has continually construed § 3–602 in an expansive manner. The General Assembly has not narrowed this language in nearly 40 years, despite having models from numerous other states to draw upon should it have wished to do so. Section 3–602 is not limited to child pornography and prostitution and encompasses "any act that involves sexual molestation or exploitation of a minor, whether

physical injuries are sustained or not." Petitioner rightly notes that most Maryland cases dealing with child sexual abuse have tended to involve a physical touching of the victim. But that does not mean that because a particular fact pattern has not yet occurred the statute is so limited. The General Assembly's concern for the welfare of children, and the myriad ways in which abusers can sexually exploit minors, militates against unduly narrowing the scope of a statute that is reasonably worded so as to reach a wide swath of behaviors, including those where a minor is sexually exploited but not physically harmed.

Petitioner argues that such an interpretation is too broad and would encompass activities that are merely romantic or intimate. He has repeatedly characterized his behavior as inappropriate, perhaps "creepy," but not criminal. The State, in contrast, argues for a definition of exploitation that would take into account the facts of a particular situation and whether the conduct "involves the sexual organs or the instincts, drives, and behaviors associated with sex" or whether "the defendant derives sexual benefit from his conduct."

Not only do we view the facts in their totality but we do so through a particular lens, i.e., "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Rivers*, 393 Md. at 580, 903 A.2d 908 (quoting *Smith*, 374 Md. at 533, 823 A.2d 664). Keeping this standard in mind, and the general principles established by our case law, we conclude that a rational trier of fact could have found the essential elements of child sexual abuse beyond a reasonable doubt.

The trial judge had ample evidence from which to decide that Petitioner's actions were sexually exploitative. The context, in which a 38–year–old man is writing to an eight-year-old girl, certainly informs the interpretation of these letters. In one note alone, Petitioner wrote that C was "pretty," "gorgeous," and "beautiful," and he shared a dream he had in which they went on a trip together to Las Vegas, where they had fun holding hands, hugging, and dancing. In

the same note, he wrote that his "heart aches" when he is away from her, his heart will always belong to her, and he thinks about kissing her sometimes but would never do it if she did not want to kiss him. "At least I can kiss your picture every night," he wrote. "I know this is a little strong but its how I feel [a]bout you." We agree with the State that these types of statements are of the kind generally made "based on male-female physical attraction" and describe activities, such as kissing, dancing, and hand holding, that have strong undertones of a physical, sexual relationship. The trial judge correctly noted that, taken as a whole, the letters contained "passionate comments that ... almost border on obsession" and feature expressions of jealousy.

Child sexual abuse can be part of a continuing course of conduct and need not hinge on a single action. This case is illustrative. Neither a trial judge or jury, as the fact-finder, nor an appellate court on review of the facts found, needs to parse every statement individually and characterize it as being sexually exploitative or not. The effect of the letters as a whole is what constitutes sexual exploitation and, therefore, the crime of child sexual abuse in this case. The above-referenced letter is representative of the tone of many of the notes Petitioner gave to C. He made several references in the letters to wanting to kiss her, including on the lips. In addition, he mentioned his desire to hold her in his arms and hug her tight; shared dreams of holding her and having her sleep in his arms; complimented her appearance and outfits; asked her to be "his girl" and "sweetheart" forever; told her he could not live without her in his life; equated his love for her with that of the vampire character Edward Cullen for the teenage girl Bella in the *Twilight* series; promised he would show his bare "abs" to her and no one else; and told her he was depressed at the thought that she had a boyfriend and it hurt him to know she might be with someone else.

His awareness that the sentiments expressed in the letters were wrong was apparent from several comments he wrote in the notes: "I know I'm not supposed to [love you]"; "I know this is a little strong but its how I feel [a]bout you"; "I really

love you and I know I'm not supposed to. I'm not some perverted child psycho stalker. I don't think perverted thoughts of you"; "Please don't think of me as some creep or monster ... I have tried to make myself not like you, but too late. I have fallen for you hard"; "I keep trying to stop feeling this way about you, but I just can't." Finally, he acknowledged an awareness that giving her the notes was wrong by telling her to "[t]ear this [note] up after you read. Tear the other notes too."

Taken together, the content of these notes qualifies as being sexually exploitative. Petitioner denies that he was hoping to physically commit any sexual acts with C or that his notes were intended to suggest this, but it is difficult to read his words and not conclude they are expressing a passionate form of love that goes far beyond mere friendship. These notes were delivered over the span of only a few months yet conveyed intense emotions, fantasies involving physical contact, and hints that these fantasies could be acted upon if C chose to do so. We decline to adopt a definition of exploitation that would require the defendant to personally receive sexual gratification or pleasure out of the conduct. As the State correctly points out, people who use children in pornography or for prostitution are not necessarily doing so for their own sexual pleasure, but may do it for financial gain. It therefore does not matter whether Petitioner became sexually aroused or received sexual gratification from receiving the notes; it is the context and the content of the notes that satisfy the "sexual" element of exploitation. The great pleasure Petitioner repeatedly describes from exchanging with C notes that carried a sexual undertone leads us to conclude that he "received a benefit" from his actions and therefore exploited her. We hold that the evidence was sufficient to convict Petitioner of child sexual abuse, as well as its attempt.

## IV.

### *Void for Vagueness*

Petitioner argues that this outcome results in a definition of sexual exploitation that is void for vagueness and fails

to provide notice as to what type of conduct is prohibited. We begin with a presumption that the statute is constitutional, and the burden rests on Petitioner to show why that is not the case. *Galloway v. State,* 365 Md. 599, 610–11, 781 A.2d 851 (2001). Petitioner argues that he must have notice of what type of activity is criminalized under § 3–602 and that the uncertainty surrounding the term "exploitation" leaves one to guess at the prohibited conduct. He contends that this lack of precision in the definition violates due process and renders the statute void for vagueness.

A "statute must be 'sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties,' otherwise, the enactment is void-for-vagueness." *McFarlin v. State,* 409 Md. 391, 410, 975 A.2d 862 (2009) (quoting *Galloway,* 365 Md. at 614, 781 A.2d 851). In analyzing a statute, we consider "whether persons of common intelligence must necessarily guess at the statute's meaning." *Id.* at 411, 781 A.2d 851 (quoting *Galloway,* 365 Md. at 615, 781 A.2d 851). "A statute is not vague under the fair notice principle if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves if they possess a common and generally accepted meaning." *Id.* A statute must give sufficient guidance so that it does not lead to arbitrary enforcement. *Id.* But "[a] law is not vague simply because it requires conformity to an imprecise normative standard." *Eanes v. State,* 318 Md. 436, 459, 569 A.2d 604 (1990).

With these principles in mind, we agree with the State that the statute is not impermissibly vague. We have previously noted that the void for vagueness doctrine is "not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning." *Eanes,* 318 Md. at 459, 569 A.2d 604 (quoting *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972)). Although § 3–602

uses broad language, it strikes a careful compromise between the need for specificity and the desire of lawmakers to craft a statute that can target the ever-shifting manner in which some people will target and abuse children. Petitioner's actions certainly fall within the rubric of sexual exploitation and we have evidence from which to conclude that he was sufficiently aware of the wrongful nature of his actions: he told C to destroy all of the notes he had given her, acknowledged it was wrong for him to love her, and expressed a fear that she would view him as "weird" or a "perverted child psycho stalker." These are not the words of a man who believes his conduct is entirely innocent and devoid of criminal consequences.[26]

For these reasons, we affirm the judgment of the Court of Special Appeals and hold that the Circuit Court had sufficient evidence from which to sustain Petitioner's convictions for child sexual abuse and its attempt.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

BELL, C.J., ADKINS and McDONALD, JJ., concur.

Concurring Opinion by McDONALD, J. which BELL, C.J. and ADKINS, J., joins.

I cannot improve upon Judge Barbera's explication of the facts or outline of the law governing this case. I write only to highlight how this Court's decision differs from the decision of the Court of Special Appeals on the search issue.

Mr. Walker had the burden of establishing that he had an *actual subjective* expectation of privacy in his desk drawers

---

**26.** Additionally, Petitioner invokes the rule of lenity to argue that any ambiguity in the statute must be construed in his favor. The rule of lenity dictates that, "where contrary interpretations of the statute are possible, we must err on the side of the accused." *State v. Weems*, 429 Md. 329, 345, 55 A.3d 921 (2012). "[T]he rule of lenity 'serves only as an aid for resolving an ambiguity and it may not be used to create an ambiguity where none exists.'" *Bourgeois v. Live Nation Entm't, Inc.*, 430 Md. 14, 37, 59 A.3d 509 (2013) (quoting *Tribbitt v. State*, 403 Md. 638, 646, 943 A.2d 1260 (2008)). Because we conclude that § 3–602 is not ambiguous, the rule of lenity does not apply.

and that his expectation was one that society would recognize as reasonable—an *objective* test. The Court of Special Appeals concluded that Mr. Walker likely did not have a subjective expectation of privacy in his workplace desk drawers, and that, even if he did, such an expectation of privacy was not objectively reasonable.

This Court wisely stopped before "even if." Buttressing a holding with alternative rationales can sometimes sweep too broadly in limiting constitutional protections. Restraint is warranted when the conduct under investigation is particularly opprobrious and it is tempting to discredit any argument potentially offering protection to the wrongdoer.[27]

Thus, the Court's holding in this case should not be taken to mean that teachers, or the many other employees who do not have private offices and who work at desks in highly trafficked areas, cannot have a reasonable expectation of privacy in the contents of their desk drawers at the workplace. Indeed, the Supreme Court has made clear that they may have an expectation of privacy protected by the Fourth Amendment in those circumstances. *See O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (public employee may have reasonable expectation of privacy in workplace desk and office); *Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20

---

27. Such restraint was well expressed by the playwright Robert Bolt in the play *A Man for All Seasons* in a passage in which Sir Thomas More, then Chancellor of England, explains to his daughter's fiancé his reluctance to arrest a courtier suspected of disloyalty to More:

Roper: So now you'd give the Devil the benefit of the law!

More: Yes. What would you do? Cut a great road through the law to get after the Devil?

Roper: I'd cut down every law in England to do that!

More: Oh! And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast ... and if you cut them down ... d'you really think you could stand upright in the winds that would blow then?....

Robert Bolt, *A Man for All Seasons* (Vintage Int'l ed.1990) at p. 66. An excellent analysis of the significance for lawyers of this passage and others from the play may be found in Stephen H. Sachs, *A Man for All Seasons: Heroism in "the Thickets of the Law"*, 41 Md. Bar J. 54 (March/April 2008).

L.Ed.2d 1154 (1968) (employee may have reasonable expectation of privacy in desk in office shared with others).

In particular, a teacher or other employee can have an objectively reasonable expectation of privacy in the drawers of a desk in an office pod. There may be a legitimate expectation of privacy even when such an employee has access to a locked cabinet of some kind, but prefers to keep personal materials close at hand in a desk drawer with the expectation that the drawer is as private, though less secure, than the locked cabinet. It would be a mistake to extend the holding of this case to all teachers with desks in an office pod.

As the Court indicates, Mr. Walker did not establish a subjective expectation of privacy. There was no direct evidence at the motions hearing that Mr. Walker had an expectation that the desk would be off-limits to others. The circumstantial evidence was at best ambivalent and, in some respects, suggested an invitation to others. As the trial judge remarked, "the labels on the drawers cry out for collegial use." In the end, Mr. Walker in effect relied on the general proposition that a workplace desk *could* be protected by the Fourth Amendment. That alone was insufficient to carry his burden.

Chief Judge BELL and Judge ADKINS join this opinion.