WATTS, J.,
dissenting, in which HARRELL, J., joins.
Respectfully, I dissent. The Majority narrowly construes a statute that the General Assembly enacted to protect children — the most vulnerable members of society — from sexual predators. In doing so, the Majority chips away at the legal deterrents against sexual exploitation of children.
In addition to exposing children to harm, the Majority Opinion is non-forward-looking. In today’s digital age, with increasing frequency, children engage in remote communica *147 tions (e.g., e-mails, telephonic conversations, or text messages) with people who have permanent or temporary care, custody, or responsibility for the supervision of them.
This issue in this case is whether a teacher can commit “sexual abuse” as defined by Md. Code Ann., Fam. Law (1984, 2012 Repl. Vol.) (“FL”) § 5-701(x)(l) (“ ‘Sexual abuse’ means any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member.”) by sexually exploiting a student through remote communications.
The Majority narrowly construes FL § 5-701(x)(1) so that it applies only to in-person contact between a child student and a teacher who is a sexual predator. I respectfully disagree with the Majority’s reasoning, and would hold that a teacher can commit “sexual abuse” as defined by FL § 5-701(x)(1) by sexually exploiting a student through remote communications.
This case’s material facts are undisputed. On January 11, 2012, the Wicomico County Department of Social Services (“the Department”), Petitioner, notified B.A.,[1] Respondent— the “grandmaster” of Park’s Martial Arts (“Park’s”), a martial arts school in Salisbury, Maryland — that the Department had found B.A. responsible for indicated child sexual abuse. B.A. appealed. On June 12, 2012, an administrative law judge (“the ALJ”) of the Maryland Office of Administrative Hearings conducted a hearing.
On July 20, 2012, the ALJ issued a decision in which the ALJ found the following facts, which I summarize. From October 2010 through Spring 2011, V.K.[2] was a fifteen-year-old female student at Park’s, where B.A. was V.K.’s teacher.[3] The record reveals that V.K. was in B.A.’s classes up to three *148 times per week, and that V.K. believed that B.A. obtained her cell phone number and e-mail address from school records. In December 2010, B.A. texted V.K. to ask for a photograph of her. In February 2011, B.A. e-mailed V.K. and attached photographs of naked- women who were posing in an erotic manner. In his e-mail, B.A. informed V.K. that he wanted her to pose like the women in the photographs. At one point, B.A. remotely informed V.K. that he could go “out of his body[,]” and that, “if she felt anything!,] it would be hi[s] having sex with her in a spiritual manner.” At approximately midnight on a night in February or March 2011, B.A. telephoned V.K., initiating a conversation that lasted until approximately 5:00 a.m. According to V.K., during this conversation, B.A. told V.K. that he wanted to “talk dirty” to her; said that he was “hard”; said that he wanted her to touch his penis; said that he wanted to have sex with her; and said that, to show her how much he loved her, he wanted to touch her vagina while he was teaching her to do a kick during martial arts class. The following morning, B.A. telephoned V.K. again, and, while breathing heavily, told V.K. that he was masturbating.
The ALJ admitted into evidence the following e-mails between B.A. and V.K. On February 28, 2011, B.A. e-mailed V.K. to state: “How are you doing? It would be good to hear from you[.]” On March 31, 2011, B.A. e-mailed V.K. to state: “I adore you so much.... I’m certain! ]ly a lucky guy.”
On May 5, 2011, B.A. e-mailed V.K. to state: “I’m very proud that [you’re] working out so hard!.]” Later that day, V.K. replied to state: “Thank you. I wanna be strong!.]” Still later that day, B.A. replied to state: “You ARE strong ... among many other wonderful traits!” (Ellipsis in original).
On May 7, 2011, B.A. e-mailed V.K. to state:
Hi Beautiful Warrior! Been thinking about [yo]u a lot.... This Friday I leave for Tai Chi weekend workshop. Wish [yo]u were going. There’s still room if [yo]u wanna go up. I’ll drive.... [H]ow was [yo]ur day? What do [yo]u do for fun? .... [D]oes [your boyfriend] ever smile, joke[,] or *149 laugh ... ? He always seems so serious[.] I would LOVE to hear from [yo]u MUCH MORE. Tell me more about [yo]ur life, thoughts, [yo]ur inner workings, etc.
(Paragraph breaks omitted). On May 8, 2011, V.K. e-mailed B.A. to tell him what she did for fun and to state: “[My boyfriend] smiles A LOT.... He just doesn’t smile around you. [H]e feels [that] you like me a little to[o] much.” Later that day, B.A. e-mailed V.K. to state: “[E]ven b[efore you] started training!, your boyfriend] was serious and somber[,] more so than any other student.” Still later that day, V.K. emailed B.A. to state: “[My boyfriend] thinks [that] you have a thing for me[.]” Still later that day, B.A. e-mailed V.K. to state: “[You’re] so sweet[.]”
At some point on May 8, 2011, V.K. e-mailed B.A. and attached a photograph of another female in a prom dress. B.A. replied to state: “I thought you were sending me pics of you. (B[y the way]: That would be nice and welcomed ... hint)[.]” (Ellipsis in original). V.K. replied to state: “I don’t think [that] pictures would be appropriate[.]”
On May 12, 2011, B.A. e-mailed V.K. to state:
I’m sorry that you got hurt in class. I ... can only hope that you’re alright? .... [Y]ou’re beyond beautiful and wonderful[,] ... and[,] every time I see you[,] my heart feels enlivened.... [D]oes [your boyfriend] know[ that] we write, and particularly that we write using these aliases[4] ... ? .... [D]ue to our “age differences” and our “professional relationship!,]” this could be seen as weird to virtually anyone.... I would erase all of our past correspondences NOW[ — ]and[,] from now on[,] use no personally identifying questions or comments unless you immediately erase them.... If you wish to share our e-mails with others!,] ... then it would be prudent to ONLY discuss “normal or professional” things using our original “normal” e-mail addresses .... Tonight[, your boyfriend] was very odd at the *150 end of class.... [Y]our varying moods and cavalier attitude when I do see you do[ ]n’t necessarily instill the utmost confidence.... I am an extremely private man[,] and [I] don’t want any[]thing about my life to be shared with anyone EVER unless I specifically say otherwise.
(Paragraph break omitted). Later that day, B.A. e-mailed V.K. to state:
Not sure why all of a sudden [your boyfriend’s] jealousy has reached such a state that he’s acting that way towards me[.] What are you saying to him? ... [H]e is just going to have to deal with guys looking at his girlfriend because she is beautiful.... If he can’t handle it[,] then maybe he should look for a girl who’s not as attractive.... I don’t want to hear anything about m[y] being “inappropriate” since I am older or a teacher.... I cannot allow this type of vibe/attitude in my work[ ]place. He’s either going to fix it[,] or I’m talking to him. And if it still doesn’t change[,] I’m going to be forced to not allow him to come anymore!,] since it will hurt our school.... [I]f you can fix it without causing more problems[,] ... then please do so.
(Paragraph breaks omitted).
The ALJ concluded as a matter of law that B.A.’s sexually explicit remote communications with V.K. constituted sexual exploitation; however, the ALJ reasoned that, because the sexual exploitation occurred via remote communications, B.A. was not providing “temporary care” for V.K. when he engaged in the sexual exploitation. Accordingly, the ALJ concluded as a matter of law that the Department had not met its burden to prove that B.A. was responsible for indicated “child abuse” as defined by FL § 5-701(x)(l), and the ALJ modified the Department’s finding that B.A. was responsible for indicated child abuse to “ruled out.”
The Department petitioned for judicial review, and the Circuit Court for Wicomico County affirmed. The Department appealed, and the Court of Special Appeals affirmed in an unreported opinion. The Department filed a petition for a writ of certiorari, which this Court granted. See Wicomico *151 Cnty. Dep’t of Soc. Servs. v. B.A., 439 Md. 328, 96 A.3d 143 (2014).
No reported Maryland opinion addresses the scope of the phrase “sexual abuse” as defined by FL § 5-701(x)(1) (“ ‘Sexual abuse’ means any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member.”). This Court, however, has addressed — and broadly construed — the scope of the term “abuse” as used in the statutes that have criminalized child abuse. Specifically, in Anderson v. State, 372 Md. 285, 287, 289-90, 812 A.2d 1016, 1018, 1019 (2002), this Court held that the evidence was sufficient to support a finding that, under a statute that criminalized child abuse,[5] a high school teacher had “responsibility for the supervision of a” student where the teacher offered to drive the student home from school; the student accepted the offer; and the teacher drove the student to the teacher’s home, where the teacher engaged in sexual intercourse with the student. This Court concluded that: (1) the student’s parent impliedly consented to the teacher’s driving the student home from school, and, thus, the teacher “assumed] the responsibility of supervising” the student; and (2) the teacher’s responsibility for the student’s supervision did not end outside school grounds, as “there was no temporal break in the” teacher-student relationship; from the time of the offer of a ride to the time of the sexual intercourse, the student “was never for long, if ever, either out of [the teacher’s] sight or, for that matter, out from under his influence or control.” Id. at 294-95, 812 A.2d at 1022 (quoting Anderson v. State, 142 Md.App. 498, 509-10, 790 A.2d 732, 739 (2002)) (emphasis added); see also Anderson, 372 Md. at 295, 812 A.2d at 1022 (“At bottom, a teacher-student relationship is *152 based on the student’s trust and acquiescence to [the] teacher’s authority. At no time was there a temporal break in that relationship so that we might conclude the relationship inducing both trust and acquiescence to authority have at least temporally ended.” (Quoting Anderson, 142 Md.App. at 510, 790 A.2d at 789) (emphasis added)). Thus, the teacher’s “official supervisory interactions with the [child] that began at school, his transportation of her that was initiated at school, and his sexual involvement with her together constituted an indivisible, ongoing relationship.” Anderson, 372 Md. at 295-96, 812 A.2d at 1023 (emphasis added) (citation and internal quotation marks omitted); see also id. at 297, 812 A.2d at 1023 (This Court favorably quoted State v. Pasteur, 9 S.W.3d 689, 697 (Mo.Ct.App.1999) (“By virtue of [the teacher]’s position, he was able to exert influence upon [the student], not only within the confines of the school, but outside of it as well.”) (Emphasis added)).
This Court’s broad construction of the statute that criminalized child abuse in Anderson, 372 Md. at 287, 812 A.2d at 1018, was warranted by the circumstance that the purpose of the statutes that criminalize child abuse is to “target the ever-shifting manner in which some people will target and abuse children[,]” Walker v. State, 432 Md. 587, 627, 69 A.3d 1066, 1090 (2013); accordingly, this Court has joined “the modern trend in broadly recognizing and punishing all forms of child abuse[,]” Degren v. State, 352 Md. 400, 424, 722 A.2d 887, 899 (1999) (footnote omitted). These considerations apply with equal force in interpreting FL § 5-701(x)(1), whose language regarding the people to whom it applies — “a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or ... any household or family member” — is substantively identical to the relevant language in the statutes that have criminalized child abuse. See Md.Code Ann., Art. 27 (1957, 1996 Repl. Vol.) § 35C(b); Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol., 2014 Supp.) (“CR”) §§ 3—601(b)(1), (d)(1) (Child Abuse), 3-602(b)(1) (Sexual Abuse of a Minor).
*153 Here, recognizing that FL § 5-701(x)(1)’s purpose, like CR § 3-602’s purpose, is to “target the ever-shifting manner in which some people will target and abuse children[,]” Walker, 432 Md. at 627, 69 A.3d at 1090, and remaining in accord with “the modern trend in broadly recognizing and punishing all forms of child abuse[,]” Degren, 352 Md. at 424, 722 A.2d at 899 (footnote omitted), even giving some deference to the ALJ’s interpretation of FL § 5-701(x)(1),[6] this Court’s precedent compels the conclusion that a teacher commits “sexual abuse” as defined by FL § 5—701(x)(1) where the teacher takes advantage of an ongoing teacher-student relationship to exert authority, influence, or control over the student via sexually exploitative remote communications. See FL § 5-701(x)(1) (“ ‘Sexual abuse’ means any act that involves sexual ... exploitation of a child by a ... person who has ... temporary care ... of a child[.]”).
As used in FL § 5 — 701(x)(1), the term “care” is not limited to in-person contact between a teacher and a student. Otherwise, the term “care” would be impermissibly redundant with the phrase “responsibility for supervision.” See Woznicki v. GEICO Gen. Ins. Co., 443 Md. 93, 108, 115 A.3d 152, 161 (2015) (A court reads a statute “so that no word ... or phrase is rendered superfluous[.]” (Citation omitted)). It is readily apparent from FL § 5-701(x)(1)’s language — “permanent or temporary care or custody or responsibility for supervision of a child” — that “care” has a meaning that is distinct from the meaning of “custody” and “responsibility for supervision.” The term “care” has a broader meaning, including: “Family law. The provision of physical or psychological comfort to another, especially] ... [a] child[.]” Care, Black’s Law Dictionary (10th ed. 2014).[7] The reason for utilizing a broad definition of “care” is obvious — the protection of children.
*154 The Majority states that “[t]his Court has previously said that ‘temporary care or custody’ is equivalent to ‘in loco parentis,’ a relatively restrictive classification that ‘arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child.’ ” Maj. Op. at 134, 141 A.3d at 216 (quoting Pope v. State, 284 Md. 309, 323, 396 A.2d 1054, 1063 (1979)). In turn, in Pope, 284 Md. at 322, 396 A.2d at 1063, this Court stated that “Bowers [v. State, 283 Md. 115, 389 A.2d 341 (1978) ] equates ‘permanent or temporary care or custody’ with ‘in loco parentis[.]’ ” (Underlining added).
In Bowers, 283 Md. at 116, 389 A.2d at 343, a defendant contended that the statute that criminalized child abuse was void-for-vagueness. Specifically, the defendant argued that
the failure of the statute to include any definition of the phrase “temporary care or custody” creates a[n] ambiguity of constitutional dimension, since neither [the defendant] nor others similarly situated would have had any way of knowing whether they fell within the class of persons [who are] subject to prosecution under the [statute].
Id. at 119, 389 A.2d at 344. This Court disagreed and stated:
[T]he [ ] General Assembly [ ] intended that the statute here apply to persons who stood in [loco parentis] to a child. Had the [General Assembly] wished to narrow application of the child abuse [statute] to those who had been awarded custody or control by court order, it could readily have done so in explicit language to that end.
Id. at 130, 389 A.2d at 350. In other words, in Bowers, id. at 130, 389 A.2d at 350, in the context of a void-for-vagueness challenge, this Court broadly construed the statute that criminalized child abuse and concluded that the statute did not apply only to people who had court-ordered custody or control of a minor.
*155 B.A.’s many e-mails to V.K. and displays of concern for V.K’s welfare constituted the administration of psychological comfort to — i.e., “care” of — V.K. On three occasions, B.A. emailed V.K. to ask how she was doing. In one such e-mail, B.A. stated: “I’m sorry that you got hurt in class[.]” On another occasion, B.A. e-mailed V.K. to state: “I’m very proud that [you’re] working out so hard[.]”[8] In essence, this case’s facts exemplify the circumstance of a teacher who administers care to a student through remote communications during an ongoing teacher-student relationship.
Just as the term “care” is not limited to in-person contact between a teacher and a student, the term “care” is not limited to contact that occurs when the student, the teacher, or both are on school grounds. This Court has already held that a teacher can be responsible for supervising a student— and thus, the teacher can commit sexual abuse of the student — when both the teacher and the student are outside the school grounds. See Anderson, 372 Md. at 287, 812 A.2d at 1018. Although “responsibility for supervision,” rather than “care,” was at issue in Anderson, id. at 287, 812 A.2d at 1018, this Court’s recognition of the power of a teacher-student relationship applies with equal force in considering “care.” This is so because, regardless of a particular case’s circumstances, “[b]y virtue of [a teacherj’s position, [the teacher is] able to exert influence upon [a student], not only within the confínes of the school, but outside of it as well.” Id. at 297, 812 A.2d at 1023 (citation omitted). Plainly put, a teacher does not stop being a teacher when he or she leaves the school grounds; regardless of the location, a teacher and a student are in an “indivisible, ongoing relationship” that “is based on the student’s trust and acquiescence to [the] teacher’s authority[,]” “influence[, and] control.” Id. at 296, 295, 812 A.2d at *156 1023, 1022 (citations and internal quotation marks omitted). It is logical that a teacher who is in an ongoing teacher-student relationship with a student, and who undertakes care for the child outside of the school grounds, must not be permitted to take advantage of the student.
Just as a teacher is able to exert authority, influence, or control over a student in person while both are outside the school grounds, the teacher is able to exert authority, influence, or control over the student via remote communications while both are outside the school grounds. In any remote communication that calls for a response — even something as simple as an e-mail in which a teacher asks: “How are you?” — the teacher, by virtue of the teacher-student relationship, obligates the student to share information and spend time and effort, however little, on a response. The teacher-student relationship plays an even greater role where the teacher directly or indirectly refers to the relationship — for example, a teacher could e-mail a student to state: “You were unusually quiet in class today. Are you okay?” If the student chooses to respond to the teacher’s remote communication, the student’s choice is at least partially driven by the teacher-student relationship; the student sees the teacher on a regular basis at the school, and the student is aware that, if the student chooses to ignore the teacher’s remote communications, the student risks having an uncomfortable and/or awkward in-person encounter with the teacher at the school. By way of hypothetical comparison, if a random stranger emailed, telephoned, or texted a minor requesting information about the minor’s life, the minor would almost certainly refrain from responding. The only plausible explanation for a student’s responses to a teacher’s remote communications is the ongoing teacher-student relationship.
Significantly, my conclusion is supported by FL § 5-701(x)(1)’s purpose, which is to protect vulnerable children from sexual predators. See Walker, 432 Md. at 627, 69 A.3d at 1090. To conclude otherwise would exempt teachers who happen to be such predators from liability for “sexual abuse” as defined by FL § 5-701(x)(1) — and, by logical extension, *157 liability under FL § 5-701(x)(1)’s criminal counterparts CR §§ 3 — 601(b)(1), (d)(1) (Child Abuse) and 3-602(b)(1) (Sexual Abuse of a Minor) — simply by virtue of the circumstance that the predators preyed on students remotely instead of in person.
Additionally, my conclusion is consistent with FL § 5-701(x)(1)’s legislative history. The first statute to use the phrase “temporary care or custody” in illegalizing harm to a minor was Md.Code Ann., Art. 27 (1957, 1963 Supp.) (“Art.27”) § 11A (Assault on Child), which the General Assembly enacted in 1963. Art. 27 § 11A stated: “Any parent, adoptive parent!)] or other person who has the permanent or temporary care or custody of a minor child under the age of fourteen years who maliciously beats, strikes, or otherwise mistreats[ ] such minor child to such degree as to require medical treatment for such child shall be guilty of a felony[.]” Obviously, the acts that Art. 27 § 11A illegalized (beating, striking, and physically mistreating) could occur only in person; however, eleven years later, the General Assembly broadened the category of illegal harm to a minor by adding sexual exploitation without physical injury. See Md.Code Ann., Art. 27 (1957, 1971 Rep. Vol., 1974 Supp.) §§ 35A(a) (“Any parent, adoptive parent[,] or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child under the age of eighteen years who causes abuse to such minor child shall be guilty of a felony[.]”); 35A(b)(7)(B) (“ ‘Abuse’ shall mean ... any sexual abuse of a child, whether physical injuries are sustained or not.” (Emphasis added)); 35A(b)(8) (“ ‘Sexual abuse’ shall mean any act or acts involving sexual molestation or exploitation!)]” (Emphasis added)).[9]
It would be illogical to conclude that the General Assembly broadened the category of illegal harm to a minor to include sexual exploitation without physical injury, yet intended to limit such illegal harm to in-person contact between an adult and a child. Of course, in 1974, many modern methods of *158 remote communication, including e-mail, text messaging, and instant messaging, were not in widespread use; however, other methods of remote communication, such as telephonic conversation and letter writing, existed in 1974 and remain in widespread use. Indeed, even today, sexual predators use these older methods of remote communication to contact victims. For example, in this case, B.A. engaged in telephonic conversation with V.K.; and, in Walker, 432 Md. at 592, 69 A.3d at 1069, a school employee wrote “to an eight-year-old female student a series of notes in which he repeatedly professed his love for her, shared fantasies of kissing and holding her, and expressed jealousy about her having a boyfriend.”
My conclusion, of course, would not alter the principle that “responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming responsibility.” Anderson, 372 Md. at 293, 812 A.2d at 1021 (citation omitted). In other words, consent remains an element of “responsibility for supervision.” I simply recognize that mutual consent, express or implied, is not required for “care.” This Court has interpreted “responsibility for supervision” to require mutual consent, stating:
‘Responsibility’ in its common and generally accepted meaning denotes ‘accountability,’ and ‘supervision’ emphasizes broad authority to oversee with the powers of direction and decision.... Absent a court order or award by some appropriate proceeding pursuant to statutory authority, we think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming responsibility. In other words, a parent may not impose responsibility for the supervision of his or her minor child on a third person unless that person accepts the responsibility, and a third person may not assume such responsibility unless the parent grants it.
*159 Id. at 293, 812 A.2d at 1021 (ellipsis in original) (citation and some internal quotation marks omitted). As stated above, “care” has a broader definition, including the provision of what is necessary for the health, welfare, maintenance, and protection of a child, and the administration of psychological comfort, which does not necessarily require mutual consent, express or implied. To conclude otherwise would lead to illogical results. For example, suppose that a child is playing outside and injures herself. A neighbor invites the child inside to get a bandage. Once inside, the child is sexually molested by the neighbor. In this scenario, the child’s parent did not consent to the neighbor’s providing care for the child. Simply stated, an adult who undertakes to provide care of a child without a parent’s consent should be held accountable for any abuse or molestation or exploitation of the child, despite the circumstance that there may have been no mutual consent, express or implied, for the adult’s care of the child.
For the above reasons, a teacher commits “sexual abuse” as defined by FL § 5-701(x)(1) where the teacher takes advantage of an ongoing teacher-student relationship to exert authority, influence, or control over the student via sexually exploitative remote communications. I note that my conclusion is expressly tied to a teacher-student relationship that is “ongoing,” and I do not express an opinion on whether FL § 5-701(x)(1) applies where there is a former teacher-student relationship or no teacher-student relationship.[10] Additionally, my conclusion would obviously not apply where a teacher does not engage in “any act that involves sexual molestation or exploitation” of a student. FL § 5-701(x)(1).[11]
*160 This case’s facts provide a prime example of how a teacher can commit “sexual abuse” as defined by FL § 5-701(x)(1) where the teacher takes advantage of an ongoing teacher-student relationship to exert authority, influence, or control over the student via sexually exploitative remote communications.
All of B.A.’s relevant e-mails to V.K. occurred while B.A. was teaching classes to V.K. up to three times per week, and many of B.A.’s e-mails to V.K. were inextricably intertwined with the ongoing teacher-student relationship. For example, in one e-mail, B.A. referred to V.K. as a “warrior,” which, ostensibly, was a reference to the fact that V.K. was a student of martial arts. On a related note, in the same e-mail, B.A. offered to drive V.K. to a workshop on tai chi, which is an exercise that is similar to martial arts. B.A. once e-mailed V.K. to state that her boyfriend “always seem[ed] so serious” at the school. Later, B.A. e-mailed V.K. to state that, “even b[efore you] started training[ at the school, your boyfriend] was serious and somberf,] more so than any other student.” (Emphasis added). Still later, B.A. e-mailed V.K. to state:
I’m sorry that you got hurt in class.... [D]ue to ... our “professional relationship[,]” this could be seen as weird to virtually anyone.... Tonight[, your boyfriend] was very odd at the end of class.... [Y]our varying moods and cavalier attitude when I do see you [at the school] do[ ]n’t necessarily instill the utmost confidence.
(Emphasis added) (paragraph breaks omitted). On the same day, B.A. e-mailed V.K. to state:
Not sure why all of a sudden [your boyfriend’s] jealousy has reached such a state that he’s acting that way towards me [at the school].... I don’t want to hear anything about *161 m[y] being “inappropriate” since I am ... a teacher.... I cannot allow this type of vibe/attitude in my work[ ]place.... I’m going to be forced to not allow him to come anymore since it will hurt our school[:]
(Emphasis added) (paragraph breaks omitted). Additionally, during a telephonic conversation, B.A. told V.K. that he wanted to touch her vagina while he was teaching her to do a kick during martial arts class.
B.A. utilized the ongoing teacher-student relationship to exert authority, influence, or control over V.K. by sending remote communications that either called for responses or included instructions to V.K. In one e-mail, B.A. offered to drive V.K. to a workshop. In one e-mail and one text message, B.A. asked V.K. for a photograph of her. In three emails, B.A. asked V.K. how she was doing. In one such email, B.A. stated: “It would be good to hear from you”; in another such e-mail, B.A. stated: “I would LOVE to hear from [yo]u MUCH MORE. Tell me more about [yo]ur life, thoughts, [yo]ur inner workings, etc.” In three e-mails, B.A. asked V.K. for information about her boyfriend. In one such e-mail, B.A. complained about what he perceived to be jealousy on V.K’s boyfriend’s part, and instructed V.K. to “fix it[.]” In another e-mail, B.A. instructed V.K. to “erase all of [their] past correspondences NOW”; to “use no personally identifying questions or comments unless [V.K.] immediately erase[d] them”; “to ONLY discuss ‘normal or professional’ things using [their] original ‘normal’ e-mail addresses” if V.K. “wish[ed] to share [their] e-mails with others”; and to refrain from “shar[ing]” “any[ ]thing about [his] life ... with anyone EVER unless [B.A.] specifically sa[id] otherwise.”
The fact that V.K. responded to many of B.A.’s remote communications offers even further support for the conclusion that B.A.’s remote communications constituted exertions of authority, influence, or control over V.K. In replies to B.A.’s emails, V.K. provided information about her life in general and her boyfriend in particular. In one e-mail, V.K. thanked B.A. for a compliment. In another e-mail, V.K. declined to provide a photograph of herself. On one occasion, after B.A. tele *162 phoned V.K. at approximately midnight, V.K. participated in the telephonic conversation for approximately five hours.
In sum, B.A., while providing “temporary care” for V.K., took advantage of the ongoing teacher-student relationship to exert authority, influence, or control over V.K. via remote communications. As the ALJ concluded (and as B.A. fails to dispute), B.A.’s sexually explicit remote communications with V.K. — namely, informing her that he wanted her to pose in an erotic manner, propositioning her for sexual intercourse, and telling her during a telephonic conversation that he was masturbating — constituted sexual exploitation. Thus, the ALJ erred in concluding as a matter of law that the Department had not met its burden to prove that B.A. was responsible for indicated “sexual abuse” as defined by FL § 5-701(x)(1).[12]
At oral reargument, the Department’s counsel stated that she did not believe that B.A. had temporary care of V.K. when B.A. sexually exploited V.K. through remote communications. Of course, a party’s erroneous concession of law does not bind this Court, which independently decides legal issues. See In re Heather B., 369 Md. 257, 266 n. 9, 799 A.2d 397, 402 n. 9 (2002) (“We independently decide issues of law and are not bound by a party’s concession of law in a particular case.” (Citation omitted)); Imbesi v. Carpenter Realty Corp., 357 Md. 375, 380 n. 3, 744 A.2d 549, 551 n. 3 (2000) (“A court ... is not bound by an erroneous concession of law.”). Regardless of the Department’s erroneous concession of law in this case, *163 B.A. had temporary care of V.K. when B.A. sexually exploited V.K. through remote communications.
Although CR § 3-324 (Sexual Solicitation of Minor) enables criminal prosecutions of sexual predators who use remote communications to prey on children, FL § 5-701 is the only means by which a county’s Department of Social Services may take action against a sexual predator where, as here, the State elects not to prosecute the sexual predator.[13] Because the Majority interprets “sexual abuse” as defined by FL § 5-701(x)(1) to require in-person contact, it is incumbent upon the General Assembly to modernize FL § 5-701(x)(1) by amending it so that it applies to sexual predators who use remote communications to prey on children.
For the above reasons, respectfully, I dissent.
Judge Harrell has authorized me to state that he joins in this opinion.

. The Court of Special Appeals granted a motion to refer to B.A. by his initials.

. To protect her privacy, I refer to V.K. by her initials.

. The record reveals that V.K. had also taken B.A.’s martial arts classes when she was younger.

. B.A. and V.K. e-mailed each other using e-mail accounts that did not identify them by name.

. At the time, the statute was codified as Md.Code Ann., Art. 27 (1957, 1996 Repl. Vol., 2001 Supp.) § 35C(b), which stated: “A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a child or a household or family member who causes abuse to the child is guilty of a felony[.]”

. ''[A]n agency’s legal interpretation of [a] statute [that] it administers ... is entitled to some deferencef.]” Charles Cnty. Dep’t of Soc. Servs. v. Vann, 382 Md. 286, 295-96, 855 A.2d 313, 319 (2004) (citations omitted).

. "Care” has also been defined as "[t]he provision of what is necessary for the health, welfare, maintenance, and protection of someone[.]” *154 Care, Oxford Dictionaries (Oxford University Press 2015), http://www. oxforddictionaries.com/us/definition/american_englislVcare [https:// perma.cc/LK4Q-GZ2E]. This definition does not imply that the care must be provided in person.

. Additionally, in three e-mails, B.A. called V.K. “beautiful.” B.A. also complimented V.K. via e-mail by calling her “attractive,” "sweet,” and "wonderful”: stating that V.K. was “strong ... among many other wonderful traits”; stating that, "every time” B.A. saw V.K., his "heart fe[lt] enlivened”; stating that B.A. "adore[d V.K.] so much”; and stating that B.A. was "certain[]ly a lucky guy.” (Ellipsis in original).

. In 1970, the General Assembly recodified Art. 27 § 11A as Art. 27 § 35A.

. For example, the AU posed a hypothetical that was similar to the following. A thirteen-year-old tutors an eight-year-old neighbor. The tutor moves away and has no contact with the other minor until six years later, at which point the two begin a consensual sexual relationship at ages nineteen and fourteen, respectively. My conclusion would not apply to this scenario because the sexual relationship did not occur while the teacher-student relationship was ongoing.

. At initial oral argument, the Department seemingly contended that, even if a teacher did not engage in any sexually explicit or suggestive *160 activity with a student at any time, the teacher might have engaged in sexual exploitation by forming a close relationship with the student. As Judge Battaglia aptly pointed out, "that leads you down a very dangerous path.” Teachers often form close relationships with students without any intention of grooming the students for sexual activity. Clearly, I do not conclude that simply forming a close relationship with a student alone constitutes sexual exploitation.

. This case’s material facts are clear and undisputed; stated otherwise, I do not know of any factual gaps in the record that require additional consideration by the ALJ. In particular, the e-mails between B.A. and V.K. speak for themselves. The ALJ concluded that B.A.’s sexually explicit remote communications with V.K. constituted sexual exploitation, and, in this Court, B.A. does not dispute that conclusion. The teacher-student relationship between B.A. and V.K. was ongoing at the time of the sexual exploitation. And, as discussed above, B.A. exerted influence, authority, or control over V.K. Thus, the undisputed facts establish that B.A., while providing "temporary care,” used an ongoing teacher-student relationship to exploit V.K. through remote communications.

. At oral reargument, the Department’s counsel stated:
I can tell you, no prosecutor is going to pick up this case. There’s too much to do out there to pick up a case where a teacher’s maybe exploiting a child. I mean, that — the law enforcement went very far and investigated it, but these are the kinds of cases that don’t get prosecuted. So, the only record of them, frequently, is the local department’s ability to maintain its files.