McDonald, j.
Under the State’s Child Abuse and Neglect Law, local departments of social services are charged, along with law enforcement, with investigating allegations of child abuse. At the conclusion of an investigation, the department is to determine whether child abuse is “indicated,” “ruled out,” or “unsubstantiated.” The department may make a finding of indicated child sexual abuse if, among other things, an individual commits an act of sexual exploitation or molestation against the child while the individual has “temporary care or custody or responsibility for the supervision of the child.”
In this case, the Respondent, a martial arts instructor, engaged in sexually explicit communications by email and telephone with a 15-year old student who regularly attended his class. All of this inappropriate behavior occurred outside of class while the instructor and student were in separate locations, usually their respective homes. Petitioner Wicomico County Department of Social Services found that the instructor had engaged in child sexual abuse under the statute. Following a hearing, an administrative law judge (“ALJ”) concluded that this finding should be reversed because the instructor did not have “care or custody or responsibility for the supervision of’ the student when she was not in his class and there was no evidence of inappropriate behavior on the instructor’s part while the student was in the instructor’s presence — a decision that the Circuit Court for Wicomico County and Court of Special Appeals affirmed on judicial review.
*125 On the record before us, there was substantial evidence to support the decision of the ALJ and the lower courts. The instructor’s out-of-class behavior was clearly inappropriate and may have violated some other statute, but it did not constitute child sexual abuse under the current statutory definition.
I
Background

A. Statutory Framework

The law defining child sexual abuse and governing the investigation of allegations of such abuse is set forth in Maryland Code, Family Law Article (“FL”), § 5-701 et seq., and in regulations adopted by the Department of Human Resources pursuant to the statute. Under the statute, “abuse” includes “sexual abuse of a child.” FL § 5 — 701(b)(2). “Sexual abuse” is defined, in pertinent part, as “any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child.... ” FL § 5-701(x)(1).[1] Examples of acts that involve sexual molestation or exploitation of a child, such as human trafficking or rape, follow in the next statutory provision. FL § 5-701(x)(2). This list is not exhaustive. See Crispino v. State, 417 Md. 31, *126 44-46, 7 A.3d 1092 (2010). The Department’s regulations elaborate that “sexual molestation or exploitation” means “sexual contact or conduct with a child” and includes a list of examples. The pertinent regulation provides:
Sexual Molestation or Exploitation.
(a) “Sexual molestation or exploitation” means sexual contact or conduct with a child.
(b) “Sexual molestation or exploitation” includes, but is not limited to:
(i) Exposure, voyeurism, sexual advances, kissing, or fondling;
(ii) Sexual crime in any degree including rape, sodomy, or prostitution;
(iii) Allowing, encouraging, or engaging in obscene or pornographic display, photographing, filming, or depiction of a child in a manner prohibited by law; or
(iv) Human trafficking.
COMAR 07.02.07.02B(42).
When a local department of social services receives a report of child abuse, it (or appropriate law enforcement agency, or both) must investigate. FL § 5-706(b). Possible civil outcomes of the investigation are: (1) abuse is “indicated,” meaning “a finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur”; (2) abuse is “ruled out,” meaning “a finding that abuse, neglect, or sexual abuse did not occur”; or (3) abuse is “unsubstantiated,” meaning “a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out.” FL § 5-701(m), (w), (y). The Department’s regulations elaborate on the evidence — or lack thereof — that supports each of those findings. See COMAR 07.02.07.12.
When the local department makes a finding of “indicated” or “unsubstantiated,” the department must inform the individual alleged to have abused the child of the finding, and the individual may request a contested case hearing under the State Administrative Procedure Act (“APA”), Maryland Code, *127 State Government Article (“SG”), § 10-201 et seq. See FL § 5-706.1; COMAR 07.02.26. The ALJ may uphold the local department’s finding or modify it. COMAR 07.02.26.14. The individual or local department may seek judicial review of the ALJ’s decision in accordance with the APA. SG § 10-222; COMAR 07.02.26.14F.
Under this statute, the local department keeps records of individuals who have been found responsible for “indicated” child abuse, or for “unsubstantiated” child abuse for a specified period of time, but no further consequences necessarily follow. See FL §§ 5-707, 5-714.
The definitions of child abuse in the Family Law Article are similar to those that appear in the statute that creates criminal liability for child neglect and abuse. See Maryland Code, Criminal Law Article (“CR”), § 3-601 et seq. For example, criminal child abuse, which can be in the first or second degree depending on its severity, is abuse committed by a “parent, family member, household member, or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor.” CR § 3 — 601(b)(1), (d)(1). This criminal provision thus uses the same phrase as the civil provision in the Family Law Article: a “person who has permanent or temporary care or custody or responsibility for the supervision of a minor.” This is unsurprising, as the civil and criminal provisions originated as parts of the same statute with the same set of definitions.[2]

*128
B. Facts

The pertinent facts, as they appear in the administrative record, are uncontested.[3] Respondent B.A.[4] is an instructor at a martial arts school in Salisbury. He has been a friend of the family of V.K., since before Ms. K.’s birth in 1995. Ms. K. took martial arts instruction from Mr. A. as a small child and, after a break, resumed taking classes with him regularly in October 2010 when she was 15 years old. During these classes, according to Ms. K., Mr. A. was “really friendly” to Ms. K. She testified that Mr. A. “spen[t] more time with [her] than with everybody else,” and he spoke with her after class about her “personal life” and “how [she] was doing.” He referred to her as “Sunlight,” a pet name that only he used for her.
In November 2010, Ms. K. missed class due to illness, and Mr. A. texted her to ask how she was doing. He added that the class missed her and that he hoped that she felt better. After this, the two of them continued to exchange texts, at first occasionally but over time with increasing frequency. *129 Around February 2011, they also began to exchange emails. They created email addresses that did not identify themselves by name and that they used to communicate only with each other. Ms. K.’s 18-year old boyfriend, D. P., also had access to Ms. K.’s account.
Around February and March 2011, their conversations turned increasingly to sexual topics. By email, Mr. A. sent Ms. K. pictures of erotically posed women and told her that he would like her to pose for pictures, but she declined to do so. Ms. K. testified that she and Mr. A. had several telephone calls, including one in which he said that he wanted to teach her a martial arts kick in class that would cause her to lift her leg onto a railing so that he could “slyly touch [her] vagina.” In telephone calls and in emails, he told her that he existed on a spiritual plane and that if she “felt anything,” he was having sex with her on the spiritual plane. In another telephone call, which Ms. K. said lasted approximately five hours, Mr. A. said that he was “hard” and that he wanted to have sex with her. She testified that they spoke again by telephone the next morning and he told her that he was touching himself. On several occasions, he invited her over to his house, nominally to “work off’ the price of her gi (a martial arts uniform) by helping him with gardening or other chores, but she declined to go. During February and March 2011, Mr. A. expressed concern that others would not understand their relationship and that Ms. K. should delete the messages that he sent to her.
According to Ms. K., they continued to correspond in much the same vein until May 2011. Around May 19, 2011, Ms. K. showed her boyfriend a message from Mr. A. that said that the boyfriend was not good enough for Ms. K. About two weeks later, the boyfriend confronted Mr. A. in his office at his martial arts studio, with Ms. K. present. According to the boyfriend, Mr. A. alternately apologized for, attempted to excuse, and denied the inappropriate communications with Ms. K. After that confrontation, Mr. A. continued to communicate with Ms. K. outside of class, but he did so with declining frequency and without sexual content. At some point in 2011, *130 Ms. K. attempted to switch out of Mr. A.’s class and by-November, she was no longer in his class.
The ALJ found that none of the sexually inappropriate conduct occurred during class. In class, Mr. A. did not touch or speak to Ms. K. in a sexual manner. She reported that he touched her hips with his hands at least once to help her with a position, but did no more.

C. Procedural History

Investigation and Finding

On November 3, 2011, the Wicomico County Department of Social Services (“Department”) received a report that Mr. A. had sent Ms. K. sexually explicit text messages and emails. On November 4, 2011, Amy Giordano, an experienced investigator for the Department, conducted recorded interviews with Ms. K. and her boyfriend about the allegations. Detective John Seichepine assisted in the investigation and obtained copies of some of the email exchanges between Mr. A. and Ms. K. and copies of their telephone records. Through his attorney, Mr. A. declined to be interviewed by the investigators. On January 6, 2012, after completion of the investigation, the Department, through Ms. Giordano, found Mr. A. responsible for indicated child sexual abuse based on the out-of-class communications.

Administrative Hearing

Mr. A. requested a hearing. On June 12, 2012, the ALJ held a contested case hearing. At the hearing, Mr. A.’s attorney argued that nothing inappropriate occurred while Ms. K. was under the care of Mr. A. at the martial arts school and that the sexually explicit communications recounted by Ms. K. occurred by telephone or electronically during off-hours when she was in her own home. The Department’s representative conceded that there was no actual sexual contact, but argued that the abuse lay in Mr. A.’s “grooming” of Ms. K. during the *131 period he was her instructor.[5]
The ALJ issued a decision on July 20, 2012. The ALJ found that it was undisputed that Mr. A. had inappropriate “sexually exploitive” communications with Ms. K. However, the ALJ noted that there was a clear temporal break between the instructor-student relationship of Mr. A. and Ms. K. at the martial arts studio and the inappropriate sexually explicit communications that took place when they were not physically together. Accordingly, the ALJ concluded, Mr. A. did not have care or custody or responsibility for the supervision of Ms. K. at the time of the sexually exploitative conduct and thus did not commit abuse under FL § 5-701(x). Pursuant to COMAR 07.02.26.14D, the ALJ ordered the Department to modify the finding of “indicated” abuse to “ruled out.”[6]

Judicial Review

The Department filed a petition for judicial review in the Circuit Court for Wicomico County. On December 21, 2012, the Circuit Court held oral argument, and on March 22, 2013, it affirmed the decision of the ALJ. The Department appealed to the Court of Special Appeals, which also affirmed the ALJ in an unreported opinion.
The Department then filed a petition for a writ of certiorari with this Court, which we granted. The issue presented by *132 the Department in its petition was whether the Department’s original finding could be supported by “grooming” behavior by Mr. A. during class — when Mr. A. had responsibility for the supervision of Ms. K. — -in conjunction with the out-of-class communications.
Following briefing and oral argument on that issue, we requested supplemental briefing on three questions:
1. In an ongoing instructor-student relationship, can “temporary care or custody or responsibility for supervision of a child” pursuant to FL § 5 — 701(x)(l) be established through remote electronic communications?
2. Can “temporary care” pursuant to FL § 5-701(x)(1) be established without the mutual consent, expressed or implied, of the one legally charged with the care of the child and of the one purportedly assuming the “temporary care”?
3. Does an instructor who has temporary care or responsibility for a child on a repeated, ongoing basis, commit child abuse within the meaning of FL § 5-701 by sexually explicit communications made via texts, telephone calls or other electronic means to the child, provided there exists a significant connection between the abusive conduct and the in-person care or responsibility?
The parties filed supplemental briefs and additional oral argument was held on those questions.
II
Discussion

A. Standard of Review

“When reviewing the decision of an administrative agency ... we review the agency’s decision directly, not the decision of the circuit court [or the intermediate appellate court].” Comptroller v. Science Applications Int’l Corp., 405 Md. 185, 192, 950 A.2d 766 (2008). Whether conduct permits a finding of indicated child abuse is a mixed question of law and fact, and we affirm the ALJ’s decision unless it is unsupported by competent, material, and substantial evidence in light of the *133 entire record as submitted. Charles County Dep’t of Soc. Servs. v. Vann, 382 Md. 286, 295-96, 855 A.2d 313 (2004). We afford no special deference, however, to the interpretation of the ALJ on matters of law. 382 Md. at 295, 855 A.2d 313.

B. Sexually Exploitative Conduct with a Child

Our task is to review the ALJ’s determination that child sexual abuse should be “ruled out” in this case. As indicated above, child sexual abuse means “any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member.” FL § 5-701(x)(1). There appears to be no question that Mr. A. engaged in sexually exploitative conduct with a child — i.e., an individual under the age of 18.[7] Ms. K. was 15 years old at the time of most of the communications and turned 16 part way through the relevant time period. Mr. A. appears to have committed at least one act enumerated in the definition of “sexual abuse,” namely encouraging a child to engage in obscene or pornographic photography or poses. See FL § 5-701(x)(2)(i); COMAR 07.02.07.02B(42)(b)(iii). Other out-of-elass communications between Mr. A. and Ms. K. could also be characterized as sexually exploitative. Cf. Walker v. State, 432 Md. 587, 625, 69 A.3d 1066 (2013) (an adult who passed notes to a child in class exploited her sexually because “the context and the content” of the notes was sexual and the adult “received a benefit” — sexual or romantic pleasure — from the notes).

C. Caretaker Status

The remaining question is whether Mr. A. fell within the class of persons covered by the statute at the time of his inappropriate behavior — i.e., whether he was a parent, household or family member, or “other person who has permanent or temporary care or custody or responsibility for the supervision of a child.” FL § 5-701(x)(1). He was not Ms. K.’s *134 parent, nor was he a household or family member, nor did he have any permanent responsibility for her. Therefore, the only possibility is that he was an “other person who has ... temporary care or custody or responsibility for supervision of’ Ms. K. It appears to be undisputed that he did have temporary responsibility for the supervision of Ms. K. during the time that she was in his martial arts class. However, the key question is whether he had such status in relation to Ms. K. at the time he engaged in sexually exploitative conduct. The ALJ concluded that he did not — a conclusion affirmed by the courts below.

Caretaker Status and Temporal Breaks

The resolution of this case depends to some extent on the construction of the pertinent statutory language — ie., what it means to have “temporary care or custody or responsibility for the supervision of’ a child. As always, we look to the “normal, plain meaning of the language of the statute.” Lockshin v. Semsker, 412 Md. 257, 275, 987 A.2d 18 (2010). The statute refers to an “act ... by a ... person who has ... temporary care or custody or responsibility for the supervision of a child.” FL § 5 — 701(x)(1) (emphasis added). The present tense indicates that the act must take place while the person has temporary care or custody or responsibility for supervision.
This Court has previously said that “temporary care or custody” is equivalent to “in loco parentis,” a relatively restrictive classification that “arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child.” Pope v. State, 284 Md. 309, 323, 396 A.2d 1054 (1979) (quoting Fuller v. Fuller, 247 A.2d 767 (D.C.1968)). However, “responsibility for ... supervision” is broader. As the Court in Pope observed:
“Responsibility” in its common and generally accepted meaning denotes “accountability,” and “supervision” emphasizes broad authority to oversee with the powers of direction and decision.... Absent a court order or award by some *135 appropriate proceeding pursuant to statutory authority, we. think it to be self-evident that responsibility for supervision of a minor child may be obtained only upon the mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming the responsibility.
284 Md. at 328, 396 A.2d 1054. Thus, the Court said, a babysitter temporarily has responsibility for the supervision of a child, and so does a school teacher when the child is at school. Id. at 324, 396 A.2d 1054. Having begun, such responsibility ends as follows:
[O]nce responsibility for the supervision of a minor child has been placed in a third person, it may be terminated unilaterally by a parent by resuming responsibility, expressly or by conduct. The consent of the third party in such circumstances is not required; he may not prevent return of responsibility to the parent. But, of course, the third person in whom responsibility has been placed is not free to relinquish that responsibility without the knowledge of the parent. For example, a sitter may not simply walk away in the absence of the parents and leave the children to their own devices.

Id.

The Court examined the significance of a temporal break in responsibility for supervision of a child in Anderson v. State, 372 Md. 285, 812 A.2d 1016 (2002). In that case, a male teacher, who was driving a 14-year-old girl home from school, took a detour to his house where he and the girl had sex. 372 Md. at 289, 812 A.2d 1016. In holding that the teacher had temporary responsibility for the supervision of his student at the time of the abusive conduct, the Court reasoned that the teacher’s responsibility for her supervision began at school and had not yet terminated when they had sex, because he had not yet delivered the girl back to her parents. Id. at 295-96, 812 A.2d 1016. Anderson relied heavily on the implied consent of the parents to “any reasonable assistance that a teacher may provide to assure the child’s return home from *136 school” and the lack of any “temporal break in the teacher and student relationship” that might, “depending on its length and nature, ... interrupt the implied consent of the parent and dispel the teacher’s duty to supervise.” Id. at 294, 812 A.2d 1016.
This understanding of the statute nearly resolves this appeal. Mr. A. had responsibility for the supervision of Ms. K. when she was in his class, but that responsibility ended when she departed the martial arts studio and her parents resumed their responsibility — thereby terminating the implied consent of the parents and the instructor’s duty to supervise. Mr. A.’s subsequent inappropriate behavior in emails and telephone calls occurred when Mr. A. did not have responsibility for her supervision during a temporal break in the teacher-student relationship, when Ms. K. was usually in her own home. By the time Ms. K. got home and exchanged the emails and telephone calls with Mr. A., her parents had responsibility for her supervision, and Mr. A. did not. Therefore, Mr. A.’s out-of-class behavior was not an “act ... by a ... person who has ... temporary care or custody or responsibility for the supervision of a child.” FL § 5-701(x)(1) (emphasis added).[8] Reprehensible as some of Mr. A.’s con *137 duct might be, without more it did not fall within the definition of child abuse under this statute.
The Department has essentially conceded this but argued, both before the ALJ and on appeal, that there is more here—ie., that Mr. A. engaged in grooming behavior in class that linked the time he was responsible for Ms. K.’s supervision to his sexually explicit out-of-class communications with her.[9]

Grooming

The Department contends that Mr. A.’s interactions with Ms. K. during, or immediately after, class constituted systematic “grooming” designed to make her susceptible to sexual exploitation. It points to her testimony that Mr. A. paid special attention to her in class and sometimes spoke to her about personal matters. The Department describes this as “inextricably intertwined with his conduct outside of class” and “part of one continuous chain of events.” The Department suggests *138 that what Mr. A. did during class enabled what he did outside of class.
Although the Department in its closing argument at the administrative hearing urged the ALJ to find that grooming occurred,[10] the ALJ found that there was no evidence of inappropriate behavior during class. Moreover, most of the behavior that the Department points to — chatting with Ms. K., sometimes about personal matters, and being “really friendly” — is the same behavior one might expect of a family friend instructing a student.
In their out-of-class communications, Mr. A. spoke at least once about the possibility of engaging in sexual contact during class, such as touching Ms. K. inappropriately while she ostensibly practiced a kick, but he apparently never acted on that idea. The Department also points out that Mr. A. at least once “put his hands on [Ms. K.’s] hips during class,” but martial arts classes frequently involve this sort of contact and even Ms. K. said that it was to assist her with a position in class.
We cannot say that the ALJ’s conclusion is clearly erroneous or unsupported by the evidence. From our review of the record, there is nothing like the in-school conduct and communications of the defendant in Walker v. State, 482 Md. 587, 69 A.8d 1066 (2013). In Walker, a teacher’s aide at an elementary school who frequently hugged and held hands with a third grade girl at the school was found to have exchanged notes in school with her that, among other things, professed his love for her, confessed that he dreamed of sleeping with her in his arms, and analogized their relationship to one depicted in a teenage romance novel. In Walker, the defendant conceded *139 that he engaged in this behavior while he had “care or custody or responsibility for the supervision of’ the girl at school. This Court held that giving the girl the notes constituted sexual exploitation because “the content and the context of the notes ... satisfy the ‘sexual’ element of exploitation” and “[t]he great pleasure [he] repeatedly describes from exchanging with [the girl] notes that carried a sexual undertone lead us to conclude that he ‘received a benefit’ from his actions and therefore exploited her.” 432 Md. at 625, 69 A.3d 1066. By contrast, in this case, the ALJ found that “[n]one of the sexually explicit telephone conversations, texting or emails ... occurred during [Ms. K.’s] taekwondo classes [and Mr. A.] did not have any sexually inappropriate conversations or touch [Ms. K] in a sexual manner when [Ms. K] was ... receiving instruction from [Mr. A.].”
Of course, as Walker indicates, context is not irrelevant. In some circumstances, actions that, by themselves, do not seem sexually exploitative might, in context, be so. For example, seemingly innocuous actions may nonetheless be sexually exploitative if they meet the standards described in Walker: they are sexual in context, and the adult performing the actions receives a benefit from them. 432 Md. at 625, 69 A.3d 1066. What matters for this case is what Mr. A. did during class, or in its immediate context (as in Anderson). We cannot simply import all of Mr. A.’s out-of-class behavior into class to satisfy the statutory definition; rather, there must be evidence that Mr. A. engaged in acts that involved sexual exploitation of Ms. K. at the time he had responsibility for her supervision.
The Department urges that this obstacle may be overcome by adopting an expansive understanding of child sexual abuse in order to protect children. See, e.g., Tribbitt v. State, 403 Md. 638, 943 A.2d 1260 (2008) (sexual abuse can be predicated on conduct that does not constitute a sexual offense in any degree or otherwise violate any provision of Maryland law); Crispino, supra (sexual abuse can be predicated on French kissing, even though that is not one of the enumerated acts in the statute). It is true that the statute refers to “any act that *140 involves sexual ... exploitation” (emphasis added), and this allows the statute to reach more broadly than if it simply referred to sexual exploitation. One meaning of “involves” is “includes,” see, e.g., Merriam-Webster’s Collegiate Dictionary (11th ed.), available at http://www.merriam-webster.com/ dictionary/involve, so any conduct that partly is not sexual exploitation and partly is sexual exploitation nonetheless involves sexual exploitation.
However, the Department has not pointed to a single action (or course of actions) that Mr. A. took during class that, in context, is even partly sexual exploitation. Being “really friendly” to a student is not sexual exploitation. Talking to a student about how she is doing and what she has done that day is not sexual exploitation. Touching a student’s hips during a martial arts class to help the student with a position ordinarily is not sexual exploitation.[11] Building trust with a student during class is not sexual exploitation.
The Department argues that Mr. A.’s intent behind his actions during class was to prepare Ms. K. for out-of-class sexual exploitation. The Department contends that this intent means that his in-class behavior “involves” sexual exploitation under the statute, even if it is not itself sexually exploitative. We do not rule out this possibility — that is, that an act can “involve” sexual exploitation because it is performed specifically in order to facilitate sexual exploitation in the future. But it is not enough to show that a teacher built trust with the student during class and subsequently attempted to sexually exploit the student outside of class. There would need to be a showing that the teacher took some specific action during class with the specific intention of facilitating sexual exploitation outside of class (rather than, for example, building trust merely in order to facilitate the physically demanding and potentially dangerous martial arts class, as any teacher might do). The fact that Mr. A. did try to sexually exploit Ms. K. *141 outside of class is not, by itself, enough to prove his intentions during class. In any event, the record reports very little of what happened during class.
If Mr. A. had given clear indications of romantic feelings during class, then the outcome might be different. See Walker, 432 Md. at 624-25, 69 A.3d 1066. If he had said or done anything inappropriate during their conversations immediately after class, while Ms. K. was still at the martial arts center, then the outcome might be different. See Anderson, 372 Md. at 295-96, 812 A.2d 1016. If there was any evidence that he intentionally attempted to use in-class time specifically for the purpose of facilitating out-of-class sexual exploitation of his student, the outcome might be different. But no facts in the record here necessarily lead to an inference that Mr. A. sexually exploited Ms. K. while he had temporary supervisory responsibility for her, and that is what the statutory definition covers.

D. Summary

Mr. A. engaged in sexually suggestive telephone and electronic communications with a 15-year-old girl. He thus engaged in sexual exploitative conduct with a child. However, there was substantial evidence to support the AL J’s conclusion that Mr. A. did not have responsibility for the supervision of Ms. K. at the time of this conduct — which occurred outside of class while Mr. A. and Ms. K. were not in each other’s presence. Mr. A. did have responsibility for the supervision of Ms. K. while she was at the martial arts school, but none of the sexually exploitative conduct occurred at that time. Although grooming behavior in class could, in conjunction with sexually exploitative conduct outside of class, support a finding of indicated child sexual abuse, the ALJ’s conclusion that there was insufficient evidence for such a finding here was not clearly erroneous.[12]
*142 We note that the Department relies on a few out-of-state cases construing statutes that appear to be broader than the Maryland statute. In some states, all that is required is that the alleged abuser be in a “position of trust” with respect to the alleged victim. See Pellman v. People, 252 P.3d 1122 (Colo.2011) (construing Colo.Rev.Stat. Ann. § 18-3-401(3.5)). The General Assembly has the power to adopt such a statute in Maryland if it wishes to do so.[13]
Ill
Conclusion
For the reasons set forth above, there is substantial evidence to support the ALJ’s determination that the Department should modify its finding from “indicated” to “ruled out.”
Judgment of the Court of Special Appeals Affirmed. Costs to be Paid by Petitioner.
ADKINS, WATTS, and HARRELL, JJ., dissent.

. The Department's regulations include a similar definition of child abuse in which the term ''caretaker” is substituted for the statutory phrase "other person who has permanent or temporary care or custody or responsibility for supervision of a child.” COMAR 07.02.07.02B(7). The regulations define "caretaker” somewhat more broadly than the phrase that it replaces:
(4) Caretaker.
(a) "Caretaker” means an individual who has, or is known to a child through having had, permanent or temporary care, custody, or responsibility for supervision of the child.
(b) "Caretaker” includes, but is not limited to, a stepparent, foster parent, guardian, custodian, or employee or volunteer in a facility or program caring for a child.
COMAR 07.02.07.02B(4) (emphasis added). This elaboration of the statutory definition was a matter of debate before the ALJ and courts below, although it is not at issue before us and the Department has disclaimed reliance upon it. See footnote 5 below.

. The civil and criminal provisions relating to child abuse were originally enacted as part of the same statute and codified in former Article 27 of the Maryland Code. Chapter 221, Laws of Maryland 1966, then codified in Maryland Code, Article 27, § 11 A. That law specified civil and criminal consequences for the same conduct. It was later recodi-fied as Article 27, § 35A. Chapter 500, Laws of Maryland 1970. A definition of "abuse” was added to the statute in 1973. Chapter 835, Laws of Maryland 1973. A definition of “sexual abuse” was added the following year. Chapter 554, Laws of Maryland 1974. The civil and criminal consequences thus related to conduct based on the same definitions.
In 1984, as part of the creation of the Family Law Article, the civil provisions were moved to the new Family Law Article. Chapter 296, Laws of Maryland 1984. Identical versions of the pertinent original *128 definitions in Article 27 were included with the civil provisions in the Family Law Article and were also retained with the criminal provisions in Article 27. The criminal provisions were later recodified as part of the new Criminal Law Article. Chapter 26, Laws of Maryland 2002. The provision concerning child sexual abuse in both the Family Law Article and the Criminal Law Article both continue to describe conduct by a "person who has permanent or temporary care or custody or responsibility for the supervision of” a child. See CR § 3-602(b); FL § 5-70 1(x).

. The evidence at the administrative hearing in this case consisted of the testimony of Ms. K., her boyfriend, the investigating police officer, and the representative of the local department who received and investigated the complaint. The Department’s investigative file, consisting largely of interview reports and a few emails retrieved from Ms. K.’s phone, was admitted in evidence, along with a video recording of the interviews of Ms. K. and her boyfriend. Although Mr. A. did not stipulate to the facts, he elected not to testify at the hearing and, in this civil context, one may infer, as the ALJ apparently did, that the events recounted by Ms. K. and the other witnesses are true.

. The Court of Special Appeals granted a motion to refer to B.A. by his initials. We also use initials to refer to certain other individuals to protect their privacy.

. This "grooming” theory was not articulated in any detail at the administrative hearing, but the Department has elaborated on it in later court filings. See footnote 10 below.
At the administrative hearing, the Department also argued that Mr. A. was a "caretaker" of Ms. K. under COMAR 07.02.07.02B(4)(a) and (b). See footnote 1 above. The AU concluded that this regulation was excessively vague and improperly extended the definitions in FL § 5-701(x) to individuals who did not have contemporaneous care, custody, or responsibility for the supervision of a child. The ALJ consequently declined to apply the definition of "caretaker” in COMAR. After the Circuit Court and the Court of Special Appeals agreed with the ALJ that this regulation exceeded the reach of the statute, the Department abandoned its reliance on the regulation in this Court, so we do not consider it.

. That regulation authorizes an ALJ, after a hearing, to order a local department to modify a finding of child abuse.

. FL§ 5-701(e).

. In her dissent, Judge Adkins suggests that we might construe the definition of "sexual abuse” — and, more specifically, its description of caretaker status — more broadly than the Court has construed its criminal counterpart in cases such as Anderson. Tempting as this approach might be, it fails because the definitions in the civil and criminal provisions originated as one. See footnote 2 above. This is not to say civil and criminal enforcement are in all respects the same. For a variety of reasons, it may be easier to prove child abuse in a civil proceeding than in a criminal prosecution. The State has a lighter burden of proof in a civil case; unlike a criminal case, adverse inferences may be drawn from a defendant's silence; and the formal rules of evidence do not apply in a civil administrative proceeding. But the legislative DNA of the definition of "child abuse” in the two statutes is identical.
In her dissent, Judge Watts argues that one may have "temporary care” of a child by engaging in remote communications with the child — e.g., by sending an email or a letter that expresses concern or by providing psychological comfort to the child. She offers several reasons for this position. She points out that this would comport with a *137 dictionary definition of "care,” which includes providing psychological comfort. In addition, she argues that "care” must be read in this fashion or else it will be redundant with "responsibility for supervision” elsewhere in the statute. She also urges that it would be consistent with the underlying legislative purpose of protecting children.
Perhaps this idea would have some merit if the statute said "provide care” or "offer care” instead of "has ... care” which, like “has ... custody,” denotes a greater responsibility. In any event, as Judge Watts concedes, the Court has already interpreted "temporary care or custody” as equivalent to "in loco parentis," which is inconsistent with Judge Watts’ suggested reading of the phrase, and has construed "responsibility for supervision” to cover one who is not in loco parentis but who nonetheless has responsibility for a child. Thus, these concepts are not redundant.
In any event, the approach suggested in Judge Watts' dissent would go well beyond this Court’s past decisions that sought to interpret the child abuse statutes to carry out the purpose of protecting children consistent with the statutory text and constitutional principles. See Pope, 284 Md. at 320-25, 396 A.2d 1054 (noting issue as to whether child abuse statute was unconstitutionally vague and construing concepts of "care or custody” and "responsibility for supervision”); Anderson v. State, 372 Md. 285, 812 A.2d 1016 (2002) (applying the concepts developed in Pope).

. The Department also agrees that the requisite caretaker status could not ordinarily be established by remote communication alone, although it might be in particular circumstances — such as when a teacher home schools children by video link.

. During its argument to the ALJ, the Department did not explain what particular conduct during class would constitute grooming. During the evidentiary portion of the administrative hearing, the investigating officer identified the email and text messages between Mr. A. and Ms. K. — which occurred outside of class — as the grooming behavior. It appears that the investigating officer viewed the out-of-class communications as grooming behavior for in-person sexual exploitation that ultimately did not materialize.

. Touching a student’s hips could be sexual exploitation if, for example, the teacher touched them inappropriately, but there is no indication of that here.

. It may be that an appropriate finding, when there is insufficient evidence that an individual who has had responsibility for the supervision of a child continued to have that responsibility at a time when the *142 individual engaged in sexually exploitative conduct, is "unsubstantiated” rather than "ruled out.” However, neither party in this case suggested that the Department's finding should be modified to "unsubstantiated.”

. The regulation that the Department disclaimed in this case also might be a starting point for such a statute. See footnote 1 above.